# EXHIBIT 8

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK
   ---------------------------------------------X
4
   WILMINGTON PT CORP.,          CASE NO. 2:19-CV-02380-LDH-SIL
5
                        Plaintiff,
6
        -against-
7
   GARY PARKER,
8
                        Defendant.
9
   ---------------------------------------------X
10
                        Held Via Zoom
11
                        August 31, 2022
12                      10:10 a.m.

13

14

15      DEPOSITION of WILMINGTON PT CORP., the

16  Plaintiff herein, by EITAN KORB, taken by the

17  Defendant, pursuant to Federal Rules of Civil

18  Procedure and Order, held at the above-mentioned

19  time and place, before a Notary Public of the

20  State of New York.

21

22

23

24

25

1

2  A P P E A R A N C E S :

3

4  HASBANI & LIGHT, P.C.
   Attorneys for the Plaintiff
5          450 Seventh Avenue
           Suite 1408
6          New York, New York  10123

7  BY:      DANIELLE WHITE, ESQ.

8

9

   YOUNG LAW GROUP, PLLC
10  Attorneys for the Defendant
           80 Orville Drive
11         Bohemia, New York  11716

12  BY:      JUSTIN PANE, ESQ.

13

14

   ALSO PRESENT: Michael Tayar, French Interpreter
15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    S T I P U L A T I O N S

5

6    IT IS HEREBY STIPULATED AND AGREED by and between

7    the attorneys for the respective parties herein,

8    that filing, sealing and certification, and the

9    same, are hereby waived.

10

11   IT IS FURTHER STIPULATED AND AGREED that all

12   objections except as to the form of the question

13   shall be reserved to the time of the trial.

14

15   IT IS FURTHER STIPULATED AND AGREED that the

16   within deposition may be signed and sworn to by

17   an officer authorized to administer an oath, with

18   the same force and effect as if signed and sworn

19   to before the Court.

20

21

22

23

24

25

1

2          M I C H A E L   T A Y A R, the French

3  interpreter herein, was duly sworn to interpret

4  the questions from English into French and the

5  answers from French into English to the best of

6  his ability:

7          E I T A N   K O R B, after having been

8  first duly sworn by a Notary Public of the State

9  of New York, was examined and testified as

10  follows:

11  EXAMINATION BY

12  MR. PANE:

13      Q    State your name for the record, please.

14      A    Eitan Korb.

15      Q    State your address, please.

16      A    66 Rue D'Aguesseau, 9211,

17  Poulonge-Billancourt, France.

18      Q    Good afternoon, Mr. Korb.  My name is

19  Justin Pane.  I am the attorney with Young Law

20  Group.  We represent an individual by the name of

21  Gary Parker.  Mr. Parker is a defendant named in

22  a foreclosure lawsuit commenced by Wilmington PT

23  Corp. in the United States District Court for the

24  Eastern District of New York on April 24, 2019.

25  The case number is 19-cv-02380, all of which

- E. Korb -

being the subject of today's deposition.

Before we start, I would like to establish a few ground rules. First, when I ask a question, please wait until both I and the interpreter finish before answering, as the reporter here with us today cannot transcribe two people speaking at the same time.

Second, all answers must be verbal since the reporter cannot transcribe responsive body language.

Third, while answering a question, please speak slowly to make it easier for the interpreter and reporter to accurately record every word that is spoken.

Fourth, please answer each question fully to the best of your knowledge. Your testimony today is given under oath and penalties of perjury. Under Federal Law, you may be fined or imprisoned not more than five years or both, if you're guilty of perjury.

Before moving forward, would you like for me to read you the Federal definition of perjury?

A No. It's okay.

1                    - E. Korb -

2       Q    Okay, as in read the definition, or

3  okay, as in do not read the definition?

4       A    No.  It will be fine.  You don't need to.

5       Q    Moving on.  If you don't know the answer

6  to a question, just say so instead of trying to

7  answer incorrectly or falsely.  An incorrect or

8  false answer may have an adverse effect on you,

9  your employer, and/or the plaintiff in the

10  foreclosure lawsuit being discussed today.

11            If you don't understand a question,

12  please let me know so I can try to rephrase it.

13            Under Federal Rules of Civil Procedure,

14  speaking objections by your attorney are

15  restricted.  As such, while your attorney may say

16  the word "objection" or state "objection to form"

17  after I've asked a question, you are still

18  required to answer the question unless your

19  attorney specifically instructs you not to answer

20  the question.

21            You can request a break at any time

22  except when a question is pending.  In such case,

23  please answer the question first before taking

24  the break.

25            Throughout this deposition I may show

1                    - E. Korb -

2   you documents, of which your attorney should have

3   already forwarded you copies of the same.  If I

4   ask you to identify the document shown to you,

5   please do so as accurately and as best as you can.

6           During the course of this deposition,

7   you may state that a document exists that I don't

8   have.  In such case, do you agree to produce that

9   document to your attorney within ten days?

10      A    I'll do my best.

11      Q    Finally, because we're doing a remote

12  deposition, I'm going to ask that you do not have

13  any communications with your counsel outside the

14  presence of the deposition.

15          I further ask that you don't accept any

16  text messages or emails from your counsel during

17  the course of this examination.

18          Is that agreeable?

19      A    Yes.

20      Q    Do you understand the rules as I have

21  just explained them to you?

22      A    Yes.

23      Q    In preparation of today's deposition,

24  without divulging any specific attorney-client

25  privilege information, did you have an

```
 1                    - E. Korb -
 2   opportunity to meet or speak with your attorney
 3   about this lawsuit and your deposition today?
 4       A    Yes.
 5       Q    When did you meet or speak with your
 6   attorney about this lawsuit and your testimony
 7   today?
 8       A    This week.
 9       Q    What day?
10       A    Daily.  A little bit every day.
11       Q    Other than you and your attorney, was
12   anyone else present when the two of you spoke?
13       A    No.
14       Q    Did you review any documents in
15   preparation of today's deposition?
16       A    Yes.
17       Q    What documents did you review?
18       A    The note, the mortgage, the allonge, and
19   the assignment of mortgage, and the Complaint.
20       Q    When were you informed that you will be
21   providing testimony at today's deposition?
22       A    I'm not sure.  A month and a half, two
23   months.
24       Q    Who informed you?
25       A    My lawyer.
```

```
1                    - E. Korb -

2      Q    Do you know why you were asked to

3  testify today?

4      A    No, not exactly.

5      Q    Have you ever been deposed before?

6      A    Yes, I have.  Once.

7      Q    Only one other time?

8      A    I believe two or three.

9      Q    Do you recall the names of those matters

10 that you gave testimony for?

11     A    Generally, yes, but I do not know the

12 precise name of the cases.

13     Q    Were you represented in those cases by

14 the attorney representing you today?

15     A    It was the same company, but I do not

16 know if it was also Danielle.

17          MR. PANE: Danielle, I just ask that

18          you produce to me the caption and

19          index number of the cases your firm

20          has represented Mr. Korb in a

21          deposition.

22          MS. WHITE: I'm not going to make

23          consent because I have to understand

24          the relevancy of it.  And to be

25          honest, I didn't conduct the
```

```
1                    - E. Korb -
2               depositions, I don't think.  They
3               were probably with another attorney
4               in my firm, so I have to figure all
5               that out.
6                 At the end of the deposition if you
7               want to send me a list of everything
8               you're going to request, then we'll
9               respond.
10      Q    Mr. Korb, are you currently under the
11  influence of or impaired by any drugs, prescribed
12  or otherwise, or alcohol?
13      A    No.
14      Q    Is there any reason why you cannot
15  provide your full attention during this
16  deposition?
17      A    No.
18      Q    Now I'm going to ask you some basic
19  background questions about your employment and
20  your history of employment as it relates to this
21  case.
22      A    Okay.
23      Q    What is the name of your current
24  employer?
25      A    Crosby Capital.
```

                    - E. Korb -

1

2      Q    Where is your office located?

3      A    Can you be more precise, please?

4      Q    Where does Crosby Capital have a

5    physical office?

6      A    Miami Beach.

7      Q    Can I please have the full address?

8      A    1688 Meridian Avenue, Miami Beach,

9    Florida 33139.

10      Q    What is your current title at Crosby

11    Capital?

12      A    I do not have a real title, but I would

13    say asset manager.

14      Q    How long have you worked for Crosby

15    Capital?

16      A    A little more than three years.

17      Q    Have you always been an asset manager

18    there or did you ever have a different title?

19      A    I've always done the same thing.  As I

20    said, it's not really a title.

21      Q    What are your job responsibilities and

22    duties as an asset manager, or whatever you want

23    to call yourself, at Crosby Capital?

24      A    There are many different aspects to the

25    position.  I have to make sure that the lawyers

```
 1              - E. Korb -
 2   have all the documents.  You have to work with
 3   the servicers for the orders, and with the
 4   custodians if there are any documents missing.
 5        Q    Do you hold any other titles or
 6   positions at Crosby Capital?
 7        A    As I mentioned earlier, it's not really
 8   a title.
 9        Q    Is Crosby Capital a limited liability
10   company or a corporation?
11        A    It's an LLC, limited liability company.
12        Q    Are you a member of that LLC?
13        A    No.
14        Q    Are you an officer of that LLC?
15        A    What is an officer?
16        Q    Usually it's a title designated to a
17   figure that has authority to act on behalf of the
18   LLC, and it is usually written in an operating
19   agreement?
20        A    I'm sorry, I did not understand.
21             MS. WHITE: Justin, you're asking
22             him whether or not he's an officer of
23             an LLC?  Do LLC's even have
24             officers?  This is a pretty legal
25             question.
```

1                    - E. Korb -

2                    MR. PANE: Fair point.  They can.

3                    Usually it's managing members and

4                    members, and then those members

5                    appoint officers.

6                    I can rephrase the question.

7      Q    Do you know if Crosby Capital has an

8    operating agreement?

9      A    I believe, yes, but because I am not a

10   member of the LLC, I cannot say for sure.

11     Q    Understood.  Thank you.

12          Do you currently hold any other titles

13   or positions at any other corporation or LLC?

14     A    No.

15     Q    Within the last five years, have you

16   held any other title or position at any other

17   corporation or LLC?

18     A    No.

19     Q    How would you describe your relationship

20   with Wilmington PT Corp., if any?

21     A    Crosby is the servicer for Wilmington PT.

22     Q    What does Crosby do for Wilmington PT

23   Corp. as a server?

24     A    Crosby manages the loans of Wilmington PT

25   as the servicer, just like FCI.  I don't know if

```
 1                    - E. Korb -
 2   you're aware of that.
 3       Q    Wilmington PT Corp. has two loan
 4   servicers for this mortgage?
 5       A    Crosby is a manager and FCI is the
 6   servicer.
 7       Q    So Crosby is not the servicer?
 8       A    It's whether we use "manager" or
 9   "servicer."  It is the same.
10       Q    Is there any written management or
11   servicing agreement between Crosby and Wilmington
12   PT Corp.?
13       A    I do not know.
14       Q    So how is it that you know that Crosby
15   manages Wilmington PT Corp.?
16       A    That's how we have done it since I have
17   been with the company.
18       Q    When you say "we," who is "we"?
19       A    I'm sorry, but in French we say "we"
20   without really meaning "we."
21                THE INTERPRETER: The interpreter
22                agrees with that.  When we say "we"
23                in French, it doesn't necessarily
24                mean we as plural.
25                MR. PANE: Would it be fair to say
```

1                    - E. Korb -

2              that I or he has done this at all

3              times he has been employed by Crosby?

4                 THE WITNESS: Yes.

5     Q    Are you an officer or shareholder of

6  Wilmington PT Corp.?

7     A    Again, I do not know what officer means,

8  but for sure I am not a shareholder.

9     Q    Do you know if or who is an officer or

10 shareholder of Wilmington PT Corp.?

11    A    No, not for sure.  Not with certainty.

12    Q    Is there someone else that you know that

13 would probably have that information?

14    A    Maybe my manager or my principal.

15    Q    Are they the same person?

16                 THE INTERPRETER: Sorry, that was

17              the interpreter.  It was one answer.

18              The answer was, "maybe my principal."

19              He did not say, my manager or

20              principal.

21    Q    Who is your principal?

22    A    His name is Yonel Devico.

23    Q    He is the principal of Crosby or of

24 Wilmington PT Corp., or both?

25    A    Crosby.

1                          - E. Korb -

2        Q      Does Wilmington PT Corp. operate out of

3    a corporate office or headquarters?

4        A      I do not know.

5        Q      Have you ever been to a building in

6    which Wilmington PT Corp. operates?

7        A      I do not know where they operate from,

8    so I'm unable to answer that question.

9        Q      Do you know if Wilmington PT Corp. has

10   any employees?

11       A      I do not know.

12       Q      Have you ever spoken to someone that

13   claims to work for Wilmington PT Corp.?

14       A      I don't believe so.

15       Q      Have you ever sent or received an email

16   to or from somebody that claimed to be employed

17   by Wilmington PT Corp.?

18       A      I don't believe so.

19       Q      In what capacity are you testifying on

20   behalf of Wilmington PT Corp. today?

21       A      It's Crosby who manages the loan and I

22   was requested by my principal to do it.

23                    (Zoom connection lost.)

24       Q      Yonel Devico requested you to appear for

25   this deposition?

1          - E. Korb -

2     A    Yes.

3     Q    But you've never seen any written

4  document authorizing Crosby to speak on behalf of

5  Wilmington PT Corp., correct?

6     A    I don't recall.

7     Q    You don't recall whether you have seen a

8  document granting such authority, or you don't

9  recall that a document exists?

10    A    I don't recall seeing one.

11    Q    Have you ever received training in

12 connection with your activities or duties that

13 you perform for Wilmington PT Corp.?

14    A    Can you please define "training"?

15    Q    Did someone ever teach you how to do

16 your job on behalf of Wilmington PT Corp.?

17    A    My manager.

18    Q    When was that training done?

19    A    When I started three years ago.

20    Q    Please describe what training you

21 received.

22    A    None.  He explained a lot of things

23 about nonperforming loans.  He explained and

24 showed me all the documents.  He explained what

25 was a custodian and servicer, and how foreclosure

1                    - E. Korb -

2  works.  That's about it.

3      Q    When he explained all of this to you,

4  was he explaining it as the procedures of Crosby,

5  or of Wilmington PT Corp.?

6                MS. WHITE: I'm going to object to

7                the question because you're talking

8                about procedures and the question

9                before had to do with training.  I

10                don't think you ever asked any

11                questions about procedures.

12                MR. PANE: Would the witness like me

13                to rephrase?

14                THE WITNESS: No.  I can answer.

15      A    I did not ask him.

16      Q    When you received the training, you did

17  not know whether it was for operations involving

18  Wilmington PT Corp. or Crosby Capital?

19                MS. WHITE: I'm going to object

20                again just because, again, if I'm

21                confused, I'm sure the witness is

22                confused.  We're going back and forth

23                on procedures and policies, but you

24                asked about training.

25                  If you want to just be more clear,

```
1                    - E. Korb -
2              I have no problem, but it's really,
3              really confusing.
4                MR. PANE: Okay.  If you can, state
5              "objection" and if he can answer, he
6              will.  If he would like me to
7              rephrase, I will, but just limit it
8              to "objection," please.
9                MS. WHITE: Okay.
10       A    Can you please rephrase that?
11       Q    Sure.  When you received training from
12   your principal, did you ever believe it was for
13   Wilmington PT Corp.?
14       A    He trained me in general.  I didn't know
15   if it was any going to be applied to Crosby
16   Capital or Wilmington PT Corp., or if I was going
17   to use it at another company if I leave, but I
18   just knew that it was going to be beneficial.
19       Q    Understood.  Thank you.
20            I'm going to ask you more specific
21   questions about Wilmington PT Corp. now.  We'll
22   get away from Crosby Capital.
23            Does Wilmington PT Corp. have or
24   implement a method or model of standardized
25   record keeping practices or procedures?
```

                    - E. Korb -

    A    It's a little vague.  Can you be more
precise, please?

    Q    For example, does Wilmington PT Corp.
have a standardized practice in place where
persons acting on its behalf make a record of the
event or act?

    A    I'm sorry, it's still vague.  I don't
understand.

    Q    If I asked you to provide me all
information Wilmington PT Corp. had regarding the
mortgage loan that is the subject of this
foreclosure, which would include when the loan
was purchased, the name of the entity that
Wilmington purchased it from, where or how would
your search begin?

    A    I'm going to search in my records.

    Q    What records?

    A    The documents I have regarding the
mortgages of the case.

    Q    Where are those records located?

    A    It all depends on what documents you're
talking about.

    Q    Let's go through all the documents.
Tell me one place where you would start looking.

                          - E. Korb -

     A     If you can maybe give me one document

and I'll tell you where I'll start searching.

     Q     Sure.  How about the mortgage?

     A     For such documents, like the mortgage

documents, they are safeguarded or kept with the

custodian.  The custodian is Richmond Monroe

Group.  The original documents are sent to them

and they safe keep them.  They scan them and they

put them on a platform that is available on the

internet.  If I needed the mortgage, for example,

I go to that platform and I download a copy of

that document.

     Q     So you have access to the documents

uploaded to the internet by Richmond?

     A     Yes.

     Q     Now tell me how Richmond gets the

documents to upload and then make available.

     A     In general, the seller of the note sends

the document to Richmond.

     Q     Is Wilmington PT Corp. the seller of the

note that underlies this foreclosure, or were

they the buyer?

     A     The buyer.

     Q     So does that mean that Wilmington PT

1                     - E. Korb -

2    Corp. did not send the documents to Monroe Group?

3         A    It means that the documents were sent by

4    the seller to Richmond.

5         Q    I'll repeat my question.  Since

6    Wilmington PT Corp. was the buyer of this loan,

7    not the seller, Wilmington PT Corp. did not send

8    the documents to Monroe Group?

9         A    Is that a question?

10        Q    Yes.

11        A    I believe that's it.

12        Q    Do you know the name of the seller that

13   sent the documents to the Monroe Group?

14        A    I believe it is Trinity.

15        Q    Do you have any way of confirming

16   whether or not it was Trinity?

17        A    I did not understand the question.

18        Q    You said you believe that Trinity was

19   the seller; is that correct?

20        A    Yes.

21        Q    Where does the foundation of that belief

22   come from?

23        A    From the allonge and the assignment of

24   mortgage.

25        Q    And that is a record that is made

```
 1                  - E. Korb -

 2   available by Monroe Group?

 3      A    Yes.

 4      Q    If I asked you how much Wilmington paid

 5   for the loan, do you have a manner or ability to

 6   find out that information?

 7               MS. WHITE: Objection.

 8      A    I believe it should be in the contract.

 9      Q    What contract?

10      A    Generally, when there is buying and

11   selling, there is a contract.

12      Q    If I wanted you to find a copy of this

13   contract, could you do it through your computer?

14      A    No.  I am there after the contract is

15   done.  I do not intervene with the buying.

16      Q    Do you have access to records of things

17   that happened beforehand?  For example, that

18   contract.

19      A    Not the contract.

20      Q    Is the contract scanned into that Monroe

21   Group system, or not?

22               MS. WHITE: Objection.

23               You can answer.  I'm just noting my

24            objection to the line of questioning

25            regarding the purchase of the note.
```

1                    - E. Korb -

2      A     I don't believe so.

3      Q     Do you have access to any documents

4  regarding this loan that is not available on the

5  Monroe Group website?

6      A     Yes.

7      Q     What documents are those?

8      A     For FCI, the servicer, there is a

9  platform, and on that platform there are many

10  documents, so it is possible for the servicer to

11  have access to these documents.

12     Q     If there was a general request for

13  documents regarding this loan, you could access

14  both the loan servicer website and Monroe Group

15  to locate documents?

16     A     Yes.  I mentioned FCI earlier, but the

17  servicer for this loan is Land Home Financial

18  Services.

19     Q     If I asked you for a copy of the

20  contract that reflects Wilmington PT's purchase

21  of a loan, do you know if that would be available

22  on the Monroe Group website, or FCI website, or

23  Land Home, if you know?

24             MS. WHITE: Objection.

25     A     The servicers do not have the contract,

```
 1                    - E. Korb -
 2   and Richmond Monroe would not have the contract
 3   either.
 4       Q    Does Wilmington PT Corp. have a copy of
 5   the contract?
 6       A    No doubt.
 7       Q    Do they have a copy that is saved on a
 8   computer system of some sort?
 9       A    Probably, but I cannot say for
10   certainty.
11       Q    Do you have access to Wilmington PT
12   Corp.'s computer records or database?
13       A    No.
14       Q    Have you ever worked for, been employed
15   by, or received any training from Lend America, a
16   New York Corporation?
17       A    No.
18       Q    Do you have any knowledge or familiarity
19   with the business record making practices and
20   procedures utilized by Lend America?
21       A    No.
22       Q    Do you have any knowledge of or
23   familiarity with the standard office mail sending
24   and receiving practices utilized by Lend America?
25       A    No.
```

                         - E. Korb -

 Q    I'm going to wind up asking you that
same series of three questions for about ten more
companies, so would you like to take a break
before we do that?

              MS. WHITE: Why don't you just give
              us the names of the companies in one
              list and ask them because I'm fairly
              certain we know the answer.  Give us
              the list of those company names in
              one shot and then ask him if he's
              familiar.

           MR. PANE: I don't know if Michael
              is going to be able to interpret that
              much at once.

           MS. WHITE: Is there another
              solution?  This is just really --
              are you going through the chain?
              Where are you getting these names
              from?

           MR. PANE: I'm going through every
              relevant party disclosed in
              disclosure thus far.

           MS. WHITE: I think if it's in the
              assignment chain, I would come up

```
 1                    - E. Korb -
 2            with a way to just ask it regarding
 3            the assignment chain.
 4              MR. PANE: There's also different
 5            servicers that are on the assignment
 6            chain.
 7              Like I said, I'll conduct this the
 8            way I deem fit.  Thank you for your
 9            suggestion but I'm trying to work
10            with Michael to make sure that he can
11            translate accurately.  If it takes
12            time, you're the one that asked for
13            the translator even though I have
14            seen prior depositions where Mr. Korb
15            did not need a translator, but this
16            is what we're going to do.
17              Can you please ask the witness if
18            he would like a break before we go
19            through these same three questions
20            for about ten different entities.
21              THE WITNESS: We can take a pause
22            after.
23              MR. PANE: Okay.
24      Q    Have you ever worked for, been employed
25   by, or received any training from Mortgage
```

1                    - E. Korb -

2  Electronic Registration Systems, Inc.?

3                    MR. PANE: Can we go off the record

4          a second.

5          (Whereupon, a discussion was held

6          off the record.)

7      Q    The question is, have you ever worked

8  for, been employed by, or received training from

9  Mortgage Electronic Registration Systems, Inc.?

10     A    No.

11     Q    Do you have any knowledge or familiarity

12  with the business record making practices and

13  procedures utilized by Mortgage Electronic

14  Registration Systems, Inc.?

15     A    No.

16     Q    Do you have any knowledge of or

17  familiarity with the standard office mail sending

18  and receiving practices and procedures utilized

19  by Mortgage Electronic Registration Systems, Inc.?

20     A    No.

21     Q    Have you ever worked for, been employed

22  by, or received any training from Ocwen Loan

23  Servicing, LLC?

24     A    No.

25     Q    Do you have any knowledge of or

```
1                    - E. Korb -
2    familiarity with the business making practices and
3    procedures utilized by Ocwen Loan Servicing, LLC?
4         A    No.
5         Q    Do you have any knowledge of or
6    familiarity with the standard office mail sending
7    and receiving practices and procedures utilized
8    by Ocwen Loan Servicing, LLC?
9         A    No.
10        Q    Have you ever worked for, been employed
11   by, or received any training from Seneca Mortgage
12   Servicing, LLC?
13        A    No.
14        Q    Do you have any knowledge of or
15   familiarity with the business record making
16   practices and procedures utilized by Seneca
17   Mortgage Servicing, LLC?
18        A    No.
19        Q    Do you have any knowledge of or
20   familiarity with the standard office mail sending
21   and receiving practices and procedures utilized
22   by Seneca Mortgage Servicing, LLC?
23        A    No.
24        Q    Have you ever worked for, been employed
25   by, or received any training from First Lincoln
```

```
 1                    - E. Korb -
 2   Loan Servicers, LLC?
 3       A    No.
 4       Q    Do you have any knowledge or familiarity
 5   with the business record making practices and
 6   procedures utilized by First Lincoln Loan
 7   Services, LLC?
 8       A    No.
 9       Q    Do you have any knowledge of or
10   familiarity with the standard office mail sending
11   and receiving practices and procedures utilized
12   by First Lincoln Loan Services, LLC?
13       A    No.
14       Q    Have you ever worked for, been employed
15   by, or received any training from Dreambuilder
16   Investments, LLC?
17       A    No.
18       Q    Do you have any knowledge of or
19   familiarity with the business record making
20   practices and procedures utilized by Dreambuilder
21   Investments, LLC?
22       A    No.
23       Q    Do you have any knowledge of or
24   familiarity with the standard office mail sending
25   and receiving practices and procedures utilized
```

```
 1                  - E. Korb -
 2  by Dreambuilder Investments, LLC?
 3      A    No.
 4      Q    Have you ever worked for, been employed
 5  by, or received any training from FCI Lender
 6  Services, Inc.?
 7      A    A little bit.
 8      Q    A little bit of employment, work,
 9  training, or all?
10      A    A little bit of training.
11      Q    When did that training occur?
12      A    It's not really training.  It's just
13  when I have questions regarding the platform.  If
14  I have a question, it's either done by Zoom or
15  they send me a demo on how to solve it.
16      Q    Understood.
17           This training is to assist you in using
18  the platform in connection with, I'm assuming,
19  viewing documents?
20      A    It's to better find and use the
21  information on the platform.
22      Q    Have you ever used that training in
23  accessing documents related to the loan
24  underlining this foreclosure?
25      A    It was a long time ago, but probably.
```

1                  - E. Korb -

2     Q    Do you have any knowledge or familiarity

3  with the business recording making practices and

4  procedures utilized by FCI Lender Services, Inc.?

5     A    Two things.  It's cutting off, but the

6  answer was, it's a little bit vague.  Can you

7  please ask it again or cut it in pieces?

8            THE INTERPRETER: That is what the

9            interpreter heard.

10    Q    Do you have any knowledge of or

11 familiarity with the internal practices of FCI

12 Lender Services, Inc. with respect to their

13 management or servicing of loan documents?

14    A    It's difficult to answer this because

15 it's too broad of a question.

16    Q    I will narrow it.

17            If a payment is made on a loan serviced

18 by FCI Lender Services, Inc., do you know how

19 they log and record that information?

20            THE INTERPRETER: I'm sorry,

21            Counsellor.  It's a little bit long.

22            Can you please cut it in two pieces?

23    Q    If a payment was made on a loan serviced

24 by FCI Lender Services, Inc., do you know how FCI

25 Lender Services logs and records that payment to

```
 1                    - E. Korb -
 2   the mortgage account?
 3       A    No.
 4       Q    When a document is mailed to FCI Lender
 5   Services, Inc., do you know the process in which
 6   they identify the mortgage account it relates to
 7   and uploads it to that account?
 8               MS. WHITE: Objection.
 9               Compound question.
10               MR. PANE: I'll break it up again,
11           Michael.
12       Q    When a document is mailed to FCI Lender
13   Services, Inc., do you know how FCI Lender
14   Services, Inc. saves and assigns that document to
15   the loan number it relates to?
16       A    No.
17       Q    When the loan servicing rights are
18   transferred from one servicer to FCI Lender
19   Services, Inc., do you know the process to board
20   the information utilized by FCI?
21       A    No.
22       Q    Mr. Korb, would you like me to give you
23   anymore specific scenarios as to business record
24   making practices and procedures of FCI?
25       A    As you wish.
```

1                          - E. Korb -

2       Q     Do you have any knowledge or familiarity

3    with the standard office mail sending and

4    receiving practices and procedures utilized by

5    FCI Lender Services, Inc.?

6       A     No.

7       Q     Have you ever worked for, been employed

8    by, or received any training from Greenwich

9    Investors XXXIII, LLC?

10      A     No.

11      Q     Do you have any knowledge or familiarity

12   with the business record making practices and

13   procedures utilized by Greenwich Investors

14   XXXIII, LLC?

15      A     No.

16      Q     Do you have any knowledge of or

17   familiarity with the standard office mail sending

18   and receiving practices utilized by Greenwich

19   Investors XXXIII, LLC?

20      A     No.

21      Q     Have you ever worked for, been employed

22   by, or received any training from Trinity

23   Financial Services, Inc.?

24      A     No.

25      Q     I apologize.  I believe the entity name

1                    - E. Korb -

2    is Trinity Financial Services, LLC.

3        A    The answer is still, no.

4        Q    Do you have any knowledge or familiarity

5    with the business record making practices and

6    procedures utilized by Trinity Financial

7    Services, LLC?

8        A    No.

9        Q    Do you have any knowledge or familiarity

10   with the standard office mail sending and

11   receiving practices and procedures utilized by

12   Trinity Financial Services, LLC?

13       A    No.

14       Q    Have you ever worked for, been employed,

15   or received any training from Land Home Financial

16   Services, Inc.?

17       A    Yes.

18       Q    Have you worked for or been employed By

19   Land Home, or received training, or all?

20       A    Training.  I received a type of

21   training.  It's complicated.

22       Q    When did this training take place?

23       A    It's the same for FCI.  It was not real

24   training.  It was just if I had any questions,

25   they would answer me and explain how the platform

```
 1                    - E. Korb -
 2   worked.
 3        Q    When was the first time you reached out
 4   to them to answer questions?
 5        A    I don't recall at all when it was.
 6        Q    If you've only worked for Crosby for the
 7   last three or four years, it must be within that
 8   time, correct?
 9        A    That's correct.  Yes.
10        Q    So was it when you first started working
11   for Crosby?
12        A    It was at the beginning.  I don't know
13   if it was the first, second, third month, but it
14   was a long time ago.
15        Q    Mr. Korb, would you be surprised to know
16   that Wilmington PT Corp. has not used Land Home
17   Financial Services as a servicer up until this
18   year, 2020?
19        A    No, I would not be surprised.
20        Q    So does that help you refresh your
21   memory as to when the first time you reached out
22   to Land Home Financial Services for assistance
23   was?
24        A    No, because it's still a long time ago,
25   two or three years, and I cannot tell you exactly
```

```
1                    - E. Korb -
2    when it was.
3        Q    Do you know if all the records held by
4    FCI Lender Services related to this loan were
5    transferred to Land Home Financial Services, Inc.?
6        A    As far as I know, yes.
7        Q    How do you know that?
8        A    Because there was an email saying that
9    there was a transfer between the two servicers.
10       Q    Who was the email sent to and from?
11       A    Since it was transferred from FCI to
12   Land Home, it was an email from FCI to Land Home.
13       Q    Mr. Korb, were you attached or copied on
14   that email?
15       A    Probably.  Yes.
16       Q    Did you review all the documents
17   attached to the email to confirm that they
18   constituted the entirety of FCI's file?
19       A    I reviewed all the documents that were
20   visible, but there are some documents that are in
21   a secure location.  I do not have access to that.
22       Q    Do you know who has access to those
23   secured documents?
24       A    It's not the documents that are
25   secured.  It's the portal that is secured.
```

```
 1                    - E. Korb -
 2       Q     Do you know who has access to that
 3   secured portal?
 4       A     Land Home.
 5       Q     Does anybody at Wilmington PT Corp. have
 6   access to those documents?
 7       A     I don't know.
 8       Q     Do you know if Yonel Devico has access
 9   to the secure portal?
10       A     I do not know.
11       Q     Just to be clear, you said that you
12   don't have access to that secured portal?
13       A     No.
14       Q     To be further clear, no, as in you don't
15   have access, or no, as in that is correct, you do
16   have access?  I just want to make it clear.  Do
17   you have access or not?
18       A     No, I don't believe I have access to the
19   secured portal.
20       Q     There was a little bit of interruption.
21   Can you just repeat that answer?
22       A     I don't believe I have access to the
23   secured portal of Land Home.  That's why it was
24   secure.
25       Q     Do you have any knowledge or familiarity
```

```
 1                      - E. Korb -
 2   with the business record making practices and
 3   procedures utilized by Land Home Financial
 4   Services, Inc.?
 5       A    Can you be more precise, please?
 6       Q    Similar to the questions I asked you
 7   about FCI, I can ask you specifics or give you
 8   scenarios.  Would you like me to do that to help?
 9       A    If it's the same questions as FCI, my
10   answers would be the same.
11       Q    I'll accept that.
12            Do you have any knowledge of or
13   familiarity with the standard office mail sending
14   and receiving practices and procedures utilized
15   by Land Home Financial Services, Inc.?
16       A    No.
17              MR. PANE: That is the end of that
18              line of questioning.  I have specific
19              questions involving Wilmington PT
20              Corp., but I did want to give Mr.
21              Korb the opportunity, and everyone
22              else, to take whatever break everyone
23              would like to take before we move
24              forward.
25                Off the record.
```

```
 1                  - E. Korb -

 2              (Whereupon, a discussion was held

 3           off the record.)

 4              (Whereupon, a recess took place.)

 5     Q    Mr. Korb, did Wilmington PT Corp. refer

 6  this foreclosure case to the original attorneys,

 7  Margolin & Weinreb, or did FCI refer the case?

 8     A    Yes.

 9     Q    It wasn't exactly a yes or no question.

10  It was a choice.  Did Wilmington PT Corp. refer

11  this foreclosure to Margolin & Weinreb, or did

12  FCI refer the case to Margolin & Weinreb?

13     A    Wilmington PT Corp. is the one who hired

14  the lawyers.

15     Q    In this case, did Wilmington PT Group

16  refer this foreclosure case to Margolin & Weinreb

17  or did FCI do it?

18     A    Wilmington PT.

19     Q    How do you know that?

20     A    They initiated the case.

21     Q    I understand that's a fact, but how do

22  you know that?

23     A    Yonel told me that, my principal.

24     Q    When did Yonel tell you that?

25     A    When I first started with Crosby three
```

```
1                    - E. Korb -
2   years ago.
3        Q    Is there a way for you to verify
4   something like this when Yonel tells you?  Could
5   you verify if Yonel's statement was accurate by
6   looking at something?
7        A    There's definitely some tracking, but I
8   don't have it.
9        Q    Please explain this tracking.
10       A    There's got to be for sure emails or
11  texts to ask Margolin & Weinreb to start the
12  case.
13       Q    Where would those emails come from?
14       A    Certainly from Yonel.
15       Q    Yonel acting in his capacity on behalf
16  of Crosby or Wilmington PT?
17       A    I cannot answer for him.
18       Q    Would you be surprised to learn if I
19  told you I had a document that says FCI referred
20  this case to Margolin & Weinreb to start?
21       A    No.  When we start the foreclosure, we
22  let the lawyers know and the servicer and, in
23  this case, it is FCI.  Then FCI's procedure is to
24  send an email or a letter to the lawyers
25  informing them that they have been retained.
```

1                      - E. Korb -

2      Q    I understand all of that to be the

3  general procedure.  I'm specifically asking in

4  this particular foreclosure case, did Wilmington

5  PT Corp. refer this foreclosure to Margolin &

6  Weinreb, or did FCI?

7      A    Wilmington decides which lawyer should

8  be hired and FCI will send an email to the lawyer

9  telling them that they're assigned to this case.

10     Q    Generally, I understand that.  In this

11 particular case, did Wilmington PT Corp. send an

12 email to FCI directing it to hire Margolin &

13 Weinreb to start the foreclosure?

14     A    Probably, but for this in case, I do not

15 know.

16     Q    Is there a way for you to find out

17 exactly what happened in this case?

18     A    You have to ask FCI.  They must have

19 records of that.

20     Q    Mr. Korb, do you have access to any

21 records on your side, particularly Wilmington PT

22 Corp., as to who hired Margolin & Weinreb?

23     A    Not right away.

24     Q    That wasn't the question.  Do you have

25 access through Wilmington PT Corp. to find out

                        - E. Korb -

1  this information?

2       A    No.

3       Q    The original answer was not right away,

4  and now the answer is, no, so I just want

5  clarification.  Which one is it, is it no, or not

6  right away?

7       A    Not right away, but if I ask FCI, I

8  might be able to.  Or the lawyers.

9       Q    Without Yonel, FCI, or the lawyers, you

10 have no ability to find out whether or not

11 Wilmington PT Corp. or FCI hired Margolin &

12 Weinreb?

13      A    No.

14      Q    Does Wilmington PT Corp. have records of

15 its communications with its attorneys?

16      A    Yes.

17      Q    How do you know that?

18      A    I have some, for example.

19      Q    When you say you have some, I don't

20 understand what that means.

21      A    I have emails that were exchanged with

22 the lawyers.

23      Q    Those emails were sent to your Crosby

24 Capital email address?

1                    - E. Korb -

2        A    Yes.

3        Q    Do you have a Wilmington PT Corp.

4    related email address?

5        A    No.

6        Q    So if I asked you to search for

7    Wilmington PT Corp. communications with its

8    attorneys, where would you look?

9        A    In my emails.

10       Q    Are you able to see Yonel Devico's

11   emails in your email?

12       A    No.

13       Q    Do you have knowledge of, or are you

14   familiar with the process in which information is

15   obtained and stored by Wilmington PT Corp. in

16   connection with the purchase of a loan, if any?

17       A    Yes.

18       Q    Please describe for me in detail the

19   process in which information is obtained and

20   stored by Wilmington PT Corp. in connection with

21   the purchase of a loan?

22       A    The first step is the seller sends an

23   excel sheet with the loan that he wants to sell.

24   There's all the information that is needed, the

25   address, the principal, the interest rate, and

                    - E. Korb -

1
2   the default date.  If we're interested, we send
3   an offer.  If the offer is accepted, we start the
4   due diligence process.  The seller will send all
5   the documents, the mortgage, the assignment of
6   mortgage, the allonge, pay history, and the
7   payoff amount.
8           He sends everything to the drop box.  We
9   analyze the documents.  Then we decide if we're
10  going to go through with the purchase or not.
11  All the documents that were received are safe in
12  the archives of Wilmington PT.
13      Q    Thank you for that detailed answer.
14  It's helpful.
15          Let's start with the seller spreadsheet.
16  Where Wilmington PT Corp. is the buyer, what
17  email address is the seller spreadsheet sent to?
18          MS. WHITE: I'm just not sure of the
19          relevance of all of this.
20      A    I don't know.
21      Q    Have you ever received one of those
22  spreadsheets to your email?
23      A    Your question is a little bit vague, but
24  I have received spreadsheets from brokers who
25  want to sell.

                        - E. Korb -

1

2      Q     They send it to your Crosby Capital

3   email address?

4      A     Yes.  Brokers that have my contact

5   information.

6      Q     How do you decide whether the purchasing

7   entity is going to be Crosby, Wilmington PT

8   Corp., Windward Bora, or some other entity?

9              MS. WHITE: I'm just noting my

10              objection to the question.

11      A     I'm not the one who decides.  I'm more

12   into the execution rather than the decision

13   making.

14      Q     Who makes that decision?

15      A     Generally, Yonel.

16      Q     When it is decided that Wilmington PT

17   Corp. is going to be the buyer, is that when the

18   seller sends over documents to support the

19   initial spreadsheet?

20      A     The seller sends the documents over when

21   the offer has been accepted.

22      Q     Just to be clear, first the spreadsheet,

23   then an offer is made, and upon acceptance, then

24   the documents are sent?

25      A     Yes.  It is in that specific order that

```
 1                    - E. Korb -
 2  you described.
 3       Q    You had mentioned that the seller will
 4  send over copies of the note, mortgage,
 5  assignment, and other documents.  Are the prior
 6  monthly mortgage statements included in that
 7  email?
 8       A    Not all the time.  It depends on the
 9  seller.
10       Q    Do you have access to the drop box
11  account that the documents are sent to by the
12  seller?
13       A    Yes.
14       Q    Do you know when the decision is made as
15  to the name of the buyer?  Let's just say Yonel
16  agrees to buy a loan.  Do you know when he
17  decides if it's going to be Wilmington PT Corp.
18  or Windward Bora or Crosby?
19                 MS. WHITE: Objection.
20                 Relevance.
21       A    It's difficult to answer for him.
22       Q    When did Wilmington PT Corp. purchase
23  the mortgage loan underlying the subject
24  foreclosure action?
25       A    It was on September 17, 2018.
```

```
 1                    - E. Korb -

 2      Q    How do you know that?

 3      A    Because of the records that I reviewed

 4  in preparation for this deposition.

 5      Q    Where did those records come from?

 6      A    It's the spreadsheet with Wilmington PT

 7  Group's acquisitions, along with the date.

 8      Q    Is Wilmington PT Group acquisitions

 9  different than Wilmington PT Corp.?

10      A    Who is Wilmington PT Group?

11      Q    I never said Wilmington PT Group.  The

12  response that I was given was that you reviewed

13  the spreadsheet of Wilmington PT Group

14  acquisitions.

15      A    I meant Wilmington PT Corp., but in

16  French, it is group.  That is the word that could

17  be used.

18      Q    So we're only talking about one

19  Wilmington PT Corp., not a similarly named other

20  corp.?

21      A    Absolutely.

22      Q    Where did you get the spreadsheet from?

23      A    It was in the business records under

24  Wilmington PT.

25      Q    Where are those records located?
```

                          - E. Korb -

1

2      A     I have a file in my computer.

3      Q     Is this a shared drive, or is this a

4 drive on that unit alone?

5      A     On my computer I have saved it, but I

6 don't remember exactly what for.

7      Q     To save it, where did you get it to put

8 it on your computer?

9      A     Yonel must have sent it to me.

10      Q     By an email or a drop box transfer, or

11 by standard mail?

12      A     I don't recall exactly how, but it must

13 have been electronically, whether drop box or

14 email.

15      Q     Is there a way for you to find out how

16 and when you received those documents on your

17 computer?

18      A     I can try, but I cannot promise you.  If

19 it was sent by drop box or USB, I wouldn't know.

20      Q     How would you try to find out that

21 information?

22      A     I will search in the email, but if it

23 was done otherwise, it would be harder.

24      Q     Does your computer have a separate area

25 that solely has Wilmington PT Corp. related

```
 1                  - E. Korb -
 2   documents?
 3       A    Yes.
 4       Q    Is this a shared drive, or is this only
 5   on your computer?
 6       A    I believe it's just on my computer.
 7       Q    Do you know how those documents got on
 8   your computer?
 9       A    I have a lot of documents.  It could
10   have been emails or something that I downloaded
11   from FCI, Monroe, or documents that were sent to
12   me by the lawyers, or documents that were done
13   through the drop box.  There are a lot of ways
14   that I receive information.
15       Q    Is it fair to say that all the documents
16   relating to Wilmington PT on your computer were
17   not sent to you by the seller, but by somebody
18   else?
19       A    Yes and no.  It could have been
20   something that Yonel transferred to me that was
21   sent by the buyer.  It could have been directly
22   transferred by the buyer.
23       Q    That sounded like a general answer.  I'm
24   asking now specifically how all the documents
25   related to this loan, whatever they may be, got
```

```
 1                    - E. Korb -
 2   on your computer?
 3        A    As I mentioned before, I don't recall
 4   exactly how.
 5        Q    Is there a way for you to find out?
 6        A    Again, I can look in my email and see if
 7   I can find something, but I cannot guarantee it.
 8        Q    Is the purchase process by Wilmington PT
 9   Corp. different for each loan that comes in, or
10   is there a checklist of things that are done in
11   purchasing a loan?
12              MS. WHITE: Objection.
13        A    I wouldn't know.  I'm more in the
14   analysis, but I can tell you one thing, that we
15   use the same procedure to analyze each loan.
16        Q    That's analyzing it to purchase it, or
17   analyzing it after the purchase?
18        A    No.  It's a little bit of both.  Before
19   we analyze all the criteria, but after the
20   purchase, it's not an analysis anymore.  It's
21   execution.
22        Q    How much did Wilmington PT Corp.
23   purchase the mortgage loan for in the underlying
24   subject foreclosure action?
25              MS. WHITE: Objection.
```

```
1                    - E. Korb -
2      A    I don't know.
3      Q    How could you find out that information?
4      A    I believe it's in the contract.
5      Q    So there's a contract that memorializes
6   the purchase?
7      A    I believe.  Yes.
8      Q    Have you seen the contract?
9      A    I don't remember it, but maybe yes.
10     Q    Is there a way for you to locate the
11  contract in Wilmington PT Corp.'s records?
12     A    For sure.
13     Q    How would you do that?
14     A    I can look in the internal files of
15  Wilmington PT to see if the contract is signed.
16     Q    Again, those files are only on your
17  computer?
18     A    These documents are in a file, but I
19  don't know if Yonel has his own records.
20     Q    What is the name of the entity that
21  Wilmington PT Corp. purchased the mortgage loan
22  in the underlying subject foreclosure action
23  from?
24     A    I believe it was Trinity Financial
25  Services, LLC.
```

- E. Korb -

1

2    Q    Does Wilmington possess any records

3 created or transferred by Trinity Financial

4 Services when it purchased the loan?

5    A    Yes.  We have the transfer of the

6 mortgage and note.

7    Q    What about the prior loan servicing

8 statements?

9    A    I'm sorry?  I didn't understand.

10    Q    What about the prior loan servicing

11 statements, the monthly statements sent by the

12 prior loan servicers?

13    A    I believe if FCI sent them, they should

14 be available with FCI because I believe those

15 were with FCI before we purchased them.

16    Q    So Wilmington PT Corp. does not have

17 monthly servicing statements, but FCI has them?

18    A    We have some, but I have to check if we

19 have all of them.

20    Q    Which ones do you have?

21    A    Off the top of my head, I don't know,

22 but I know that we have 2018, '19, and '20, for

23 example.

24    Q    My question was for the mortgage

25 statements prior to Wilmington PT's purchase, so

```
 1                    - E. Korb -
 2  from the prior owner.
 3      A    I know we have them from 2018, but for
 4  2016 and 2017, I have to check.
 5      Q    And the same, I assume, would go for
 6  statements from 2010, 2011?
 7      A    Exactly.
 8      Q    Are you aware that in response to the
 9  document demand made by my office, it was
10  represented that you had no statements prior to
11  2018?
12      A    If we had answered that, I'm not
13  surprised, because as I mentioned, I'm not sure
14  if we have any.
15      Q    Is there a way for you to see if anyone,
16  other than yourself, reviews Wilmington PT
17  Corp.'s documents?
18      A    Yonel can do it, but generally it's me.
19      Q    Do you mean that Yonel can access them,
20  but it's generally you?
21      A    Yes.
22      Q    My question was whether or not you can
23  see on some kind of computer screen whether
24  someone else accessed a Wilmington PT document,
25  if there's a log that shows who touched the
```

                        - E. Korb -

1

2  document, who opened it, who printed it, who sent

3  it?

4      A    I don't think so.

5      Q    I'm going to show you some documents

6  now.  When I give them to you, I'll give you some

7  time to review it, and when you're done just look

8  up at me and tell me you're ready to hear some

9  questions.

10     A    Okay.

11     Q    I'm going to introduce Defendant's

12 Exhibit 1.  It is the document that was sent to

13 Danielle.

14          I'm not sure, Mr. Korb, if you received

15 a copy of Exhibit 1.

16     A    Are you going to share it on the screen?

17     Q    I sent it over to everyone to, I guess,

18 to print out to make it easier.

19          MS. WHITE: I'll send it to him now.

20     Q    If you look at that document, on the top

21 right you should see in red font page ID number 1

22 being the first page, and the last page being

23 page ID number 57.

24     A    Yes.

25     Q    I'm going to give you a moment to review

```
1                        - E. Korb -
2   it and you can let me know that you have reviewed
3   it and we can start asking some questions.
4        A     (Reviewing document.)
5              That's fine for me.
6        Q     Have you seen this document before?
7        A     Yes.
8        Q     Where did you see this document?
9        A     On my laptop.
10       Q     When was the first time you saw this
11  document?
12       A     I don't recall.
13       Q     Have you seen this document before
14  today?
15       A     Yes.
16       Q     Do you know what this document is?
17       A     Complaint.
18       Q     Do you understand what that is, a
19  Complaint?
20       A     I believe so.
21       Q     I'm going to direct your attention to
22  page ID number 2, so page two of that document.
23  I want you to read paragraph two of the Complaint
24  to yourself and look up whenever you're done
25  reading it.
```

```
1                    - E. Korb -

2      A     (Reading document.)

3            That's good.

4      Q     Are the allegations contained in

5   paragraph two of the Complaint entirely true and

6   factually correct in every respect?

7      A     I believe.  Yes.

8      Q     What is the basis of your belief?

9            MS. WHITE: Objection.

10     A     Because I believe Wilmington PT Corp. is

11  a Delaware company.

12     Q     How do you know that?

13     A     Because it is in the articles of the

14  company.

15     Q     Do you have access to those articles?

16     A     Yes.  It's the business records.

17     Q     Where are those records?  Are they on

18  your computer right now or would you have to look

19  someplace else?

20     A     On my computer, I think.

21     Q     Please read paragraph three of the

22  Complaint to yourself and look up whenever you're

23  done.

24     A     (Reading document.)

25           Fine.
```

- E. Korb -

1

2     Q    Are the allegations contained in

3 paragraph three of the Complaint entirely true

4 and factually correct in every respect?

5     A    I believe. Yes.

6     Q    Does Wilmington PT Corp. update its

7 records whenever new information may come to

8 light?

9     A    I can tell you yes, but you have to be

10 more specific.

11     Q    Paragraph three says, Gary Parker has an

12 address of 42 Roundtree Drive, Melville, New York

13 11747. Do you agree?

14     A    I agree with that.

15     Q    Do you or Wilmington PT Corp. have any

16 knowledge of the fact that by decision and order

17 dated September 10, 2021, a court ruled and

18 confirmed defendant had not resided at that

19 property address since at least March of 2017.

20 That defendant has resided at 160B Heritage

21 Hills, Somers, New York since March, 2017, and

22 defendant's tenants, Barry Lindor and Eileen

23 Lindor, have resided at the mortgage premises

24 since at least March of 2017?

25     A    Yes. I believe yes, because a judgment

```
1                    - E. Korb -
2   has been pulled and we had to restart.  I believe
3   the recipient has to notify the lender if he
4   changes his address.
5        Q    Now after reading paragraph three, are
6   the allegations contained in paragraph three
7   entirely true and factually correct in every
8   respect?
9             MS. WHITE: Objection.
10             You have to specify as to time and
11             scope.  We don't know when you're
12             talking about.
13             MR. PANE: Objection is noted.
14       A    It was correct at one point, but then it
15   stopped being correct.
16       Q    At what point was it right and when did
17   it stop?
18       A    I don't have an exact date, but I
19   believe it's since 2017.
20       Q    You testified earlier that you were not
21   sure whether or not you had servicing statements
22   prior to 2018; is that correct?
23       A    Yes.
24       Q    Would you be surprised to learn that the
25   defendant sent the prior loan servicer notice of
```

```
 1                    - E. Korb -
 2   the address change?
 3      A    No, I would not be surprised if he did it.
 4      Q    Did you ever search the records that
 5   were transferred to Wilmington PT Corp. for such
 6   notices?
 7      A    Generally yes, but otherwise we trust
 8   the information that we receive from the seller.
 9      Q    Is there a way for you to look at your
10   records to confirm whether or not a search was
11   done in this case for that notice?
12      A    The answer is, no.  Right away, no.
13      Q    Is there a log that is kept for all the
14   different searches that are done with particular
15   loans?
16      A    No.
17      Q    Who normally would make such a search,
18   would it be you, Yonel, or somebody else?
19      A    Yonel or myself.
20      Q    Anyone else?
21      A    No.
22      Q    Is it standard practice for you to do
23   this on behalf of Wilmington PT Corp.?  When I
24   say "do this," I mean search for borrower
25   correspondences in the loan file?
```

```
1                    - E. Korb -

2        A    Yes.

3        Q    But there is no way to confirm whether

4   it was done in this particular case?

5        A    To the best of my knowledge, yes, but

6   there is no log or anything to confirm that it

7   was done.  It was done a long time ago.

8        Q    Is there a log to confirm any acts

9   whenever they're done with regard to a Wilmington

10  PT Corp. loan?  For example, if I were to send to

11  you a letter asking for information, would that

12  be put in a log somewhere?

13       A    It would be in the email if we look for

14  it, but there is no entry log.

15       Q    What about if it was sent by regular mail?

16       A    No log.

17       Q    Can you please go to page ID number

18  three and refer to paragraph 11 and read that.

19       A    (Reading document.)

20            Yes.

21       Q    Are the allegations contained in

22  paragraph 11 of the Complaint entirely true and

23  factually correct in every respect?

24       A    Yes.

25       Q    But earlier you told me that Monroe
```

1                          - E. Korb -

2     Group had physical possession of the original

3     note.  Are you now saying that Wilmington PT

4     Corp. has physical possession?

5         A    If the custodian has them, and if the

6     custodian works or acts on behalf of Wilmington PT.

7         Q    That's a very general response.

8              Specifically, who held physical

9     possession of the original note on April 24, 2019?

10        A    Richmond Monroe is the name of the custodian.

11        Q    They held physical possession on April 24,

12    2019 of the original note?

13        A    Yes.

14        Q    If you can turn to page ID number four,

15    I'm going to direct your attention to paragraph

16    13.  If you can read that to yourself and let me

17    know whenever you're finished reading.

18        A    (Reading document.)

19             Yes.

20        Q    Are the allegations contained in

21    paragraph 13 of the Complaint entirely true and

22    factually correct in every respect?

23        A    I believe, yes.

24        Q    What is the basis for your belief?

25        A    There is a copy of the demand letter

1                    - E. Korb -

2    that is available.

3         Q    Where is that available?

4         A    It's in Exhibit E.

5         Q    That document has the heading, The

6    Margolin & Weinreb Law Group, correct?

7         A    Off the top of my head, yes.

8         Q    So how does Wilmington PT Corp. know

9    that that was sent by Margolin & Weinreb?

10        A    Because when Margolin & Weinreb sends

11   something, they send Wilmington PT a copy.

12        Q    So you're relying on Margolin & Weinreb

13   telling you they sent it, you didn't send it?

14        A    That's correct.

15        Q    I'm going to bring your attention to

16   page ID number 14.  Have you seen this document

17   before?

18        A    Are we talking about the mortgage?

19        Q    Yes.  It looks like page one of the

20   mortgage.  Again, it's page ID number 14.

21        A    Yes, I have seen it before.

22        Q    I'm going to direct your attention to

23   the area of that page that has a capital B as the

24   paragraph and it's entitled "Borrower."

25             Can you just read to me the full

- E. Korb -

paragraph B, everything that it says in paragraph B?

A    Gary Parker, whose address is 1426
Heritage Hills, Somers, New York 10589.

Q    Can you tell me whether or not
Wilmington PT Corp. has that Heritage Hills,
Somers, New York address anywhere in its records?

A    Maybe this address is in the loan tape
that the seller sent us.

Q    Does Wilmington PT Corp. look at
documents, such as a mortgage and a note, to
confirm the information such as the interest rate
and the amount due?

A    Yes, but the loan was done in 2006 and
he bought it in 2018, so you have to make sure
that there hasn't been any changes regarding the
terms in the note.

Q    Does Wilmington PT Corp. have any
records of defendant mailing a notice of a change
of address to any of the prior holders or
servicers of the mortgage loan?

MS. WHITE: Objection.

I thought you already asked that
question.  Do you want to check the
transcript right now?

```
 1                    - E. Korb -
 2              MR. PANE: I might have, but he can
 3           answer it.
 4     A    It's possible.  I don't remember from
 5  the top of my head.  I'll have to check.
 6     Q    Where would you check?
 7     A    I would look in the internal business
 8  records of Wilmington PT.
 9     Q    Is it fair to say that you rely on three
10  places to locate documents relating to this loan,
11  the loan servicer platform for FCI, the one for
12  Land Home Financial Services, and your own computer?
13     A    Yes.  I can also add the documents that
14  could be sent by the lawyers.
15     Q    Please turn your attention to page ID
16  number 28 through 30.
17           Have you seen this three-page document
18  before?
19     A    Yes.
20     Q    Do you know what it is?
21     A    Yes.
22     Q    Did Wilmington PT Corp. or Monroe Group
23  physically possess the original of this
24  three-page promissory note on April 24, 2019?
25              MS. WHITE: Objection.
```

```
 1                    - E. Korb -
 2              You said it's a three-page
 3              document.  It's not.
 4    Q    Please answer the question.
 5              MR. PANE: Objection noted.
 6              MS. WHITE: He can't answer the
 7              question the way you just phrased it
 8              because you just phrased it as three
 9              pages, which it is not.  So he cannot
10              answer the question unless you ask it
11              correctly.
12              You can ask him and he can answer
13              it when you state the correct number
14              of pages for the document.
15              MR. PANE: Are you instructing your
16              witness not to answer the question?
17              MS. WHITE: The way it's phrased
18              right now, yes.  You're not asking a
19              correct question.  Legally, it's not
20              a correct question.
21              MR. PANE: So you have an objection
22              to form.  Noted.
23    Q    Answer the question, please, Mr. Korb.
24              MS. WHITE: Answer it to the best of
25              your ability.
```

1                    - E. Korb -

2      A     The original note was held by Richmond Monroe.

3      Q     On April 24, 2019?

4      A     Yes.

5      Q     Do you see on the bottom of pages

6   ID 28, 29 and 30 something that reads, page one

7   of three, two of three, and three of three?

8      A     Yes.

9      Q     So I will again ask, did Richmond Monroe

10   Group have physical possession of those three

11   original pages on April 24th of 2019?

12      A     Yes.  They had the original note on the

13   24th of April, 2019.

14      Q     Do you agree that each of those three

15   pages that I have mentioned have two punch mark

16   holes on the top of each of those three pages?

17      A     We can say, yes, that looks like holes,

18   but it is hard to tell virtually like this.

19      Q     I'm going to rephrase.  Would you agree

20   that there are two round, large, bold dots on the

21   top of pages 28, 29, and 30 of the three page note?

22      A     Yes.

23      Q     Would you also agree that no big, bold,

24   black dots are evidenced at the top of the pages

25   labeled page ID 31 and page ID 32?

```
1                    - E. Korb -

2      A     There are no black dots there.

3                   MR. PANE: I'm going to take a

4              three-minute recess, and I believe

5              after that we're probably done.  If

6              not, just one or two follow-ups.

7              Just a quick recess to make sure I

8              covered everything I wanted to.

9                (Whereupon, a recess took place.)

10               MR. PANE: Back on the record.

11               I have no further questions for the

12             witness today.  I appreciate

13             everyone's patience.

14               Mr. Korb, I believe it's 8:15 local

15             time for you so you can get some

16             sleep and maybe some food.

17               THE WITNESS: Thank you so much.

18               MS. WHITE: Thank you.

19

                 (Time noted: 2:15 p.m.)
20

21             _____

                         EITAN KORB
22

23

     Subscribed and sworn to before me
24   this _____ day of _____, 2022

25
```

```
1                    - E. Korb -

2                    I N D E X

3

4    WITNESS

5        Eitan Korb

6
     EXAMINATION BY                        PAGE
7
         Mr. Pane                            4
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        - E. Korb -

2                      CERTIFICATION

3

4

5

6       I, LAURA PINTO, a Notary Public in and for

7    the State of New York, do hereby certify:

8       THAT the witness whose testimony is

9    hereinbefore set forth, was duly sworn by me; and

10       THAT the within transcript is a true record

11   of the testimony given by said witness.

12       I further certify that I am not related,

13   either by blood or marriage, to any of the

14   parties to this action; and

15       THAT I am in no way interested in the outcome

16   of this matter.

17       IN WITNESS WHEREOF, I have hereunto set my

18   hand this 11th day of September 2022.

19

20                        Laura Pinto

21    _____

22                     LAURA PINTO

23

24

25
```

**A**

**ability (4)**
4:6;23:5;43:11;
66:25
**able (3)**
26:14;43:9;44:10
**Absolutely (1)**
48:21
**accept (2)**
7:15;39:11
**acceptance (1)**
46:23
**accepted (2)**
45:3;46:21
**access (22)**
21:14;23:16;24:3,
11,13;25:11;37:21,
22;38:2,6,8,12,15,16,
17,18,22;42:20,25;
47:10;54:19;57:15
**accessed (1)**
54:24
**accessing (1)**
31:23
**account (4)**
33:2,6,7;47:11
**accurate (1)**
41:5
**accurately (3)**
5:14;7:5;27:11
**acquisitions (3)**
48:7,8,14
**act (2)**
12:17;20:7
**acting (2)**
20:6;41:15
**action (3)**
47:24;51:24;52:22
**activities (1)**
17:12
**acts (2)**
61:8;62:6
**add (1)**
65:13
**address (15)**
4:15;11:7;43:25;
44:4,25;45:17;46:3;
58:12,19;59:4;60:2;
64:3,7,8,20
**administer (1)**
3:17
**adverse (1)**
6:8
**afternoon (1)**
4:18
**Again (9)**
15:7;18:20,20;32:7;
33:10;51:6;52:16;
63:20;67:9
**ago (6)**
17:19;31:25;36:14,
24;41:2;61:7
**agree (6)**
7:8;58:13,14;67:14,
19,23
**agreeable (1)**
7:18
**AGREED (3)**
3:6,11,15
**agreement (3)**
12:19;13:8;14:11
**agrees (2)**
14:22;47:16
**alcohol (1)**
10:12
**allegations (5)**
57:4;58:2;59:6;
61:21;62:20
**allonge (3)**
8:18;22:23;45:6
**alone (1)**
49:4
**along (1)**
48:7
**always (2)**
11:17,19
**America (3)**
25:15,20,24
**amount (2)**
45:7;64:13
**analysis (2)**
51:14,20
**analyze (3)**
45:9;51:15,19
**analyzing (2)**
51:16,17
**and/or (1)**
6:9
**answered (1)**
54:12
**anymore (2)**
33:23;51:20
**apologize (1)**
34:25
**appear (1)**
16:24
**applied (1)**
19:15
**appoint (1)**
13:5
**April (7)**
4:24;62:9,11;65:24;
67:3,11,13
**archives (1)**
45:12
**area (2)**
49:24;63:23
**articles (2)**
57:13,15
**aspects (1)**
11:24
**asset (3)**
11:13,17,22
**assigned (1)**
42:9
**assignment (7)**
8:19;22:23;26:25;
27:3,5;45:5;47:5
**assigns (1)**
33:14
**assist (1)**
31:17
**assistance (1)**
36:22
**assume (1)**
54:5
**assuming (1)**
31:18
**attached (2)**
37:13,17
**attention (6)**
10:15;56:21;62:15;
63:15,22;65:15
**attorney (11)**
4:19;6:14,15,19;
7:2,9;8:2,6,11;9:14;
10:3
**attorney-client (1)**
7:24
**attorneys (4)**
3:7;40:6;43:16;
44:8
**authority (2)**
12:17;17:8
**authorized (1)**
3:17
**authorizing (1)**
17:4
**available (8)**
21:10,18;23:2;24:4,
21;53:14;63:2,3
**Avenue (1)**
11:8
**aware (2)**
14:2;54:8
**away (6)**
19:22;42:23;43:4,7,
8;60:12

**B**

**back (1)**
18:22
**background (1)**
10:19
**Barry (1)**
58:22
**basic (1)**
10:18
**basis (2)**
57:8;62:24
**Beach (2)**
11:6,8
**beforehand (1)**
23:17
**begin (1)**
20:16
**beginning (1)**
36:12
**behalf (8)**
12:17;16:20;17:4,
16;20:6;41:15;60:23;
62:6
**belief (3)**
22:21;57:8;62:24
**beneficial (1)**
19:18
**best (6)**
4:5;5:17;7:5,10;
61:5;66:24
**better (1)**
31:20
**big (1)**
67:23
**bit (9)**
8:10;31:7,8,10;
32:6,21;38:20;45:23;
51:18
**black (1)**
67:24
**board (1)**
33:19
**body (1)**
5:10
**bold (2)**
67:20,23
**Bora (2)**
46:8;47:18
**borrower (2)**
60:24;63:24
**both (5)**
5:5,20;15:24;24:14;
51:18
**bottom (1)**
67:5
**bought (1)**
64:15
**box (1)**
45:8;47:10;49:10,
13,19;50:13
**break (6)**
6:21,24;26:4;27:18;
33:10;39:22
**bring (1)**
63:15
**broad (1)**
32:15
**brokers (2)**
45:24;46:4
**building (1)**
16:5
**business (14)**
25:19;28:12;29:2,
15;30:5,19;32:3;
33:23;34:12;35:5;
39:2;48:23;57:16;
65:7
**buy (1)**
47:16
**buyer (8)**
21:23,24;22:6;
45:16;46:17;47:15;
50:21,22
**buying (2)**
23:10,15

**C**

**call (1)**
11:23
**can (45)**
6:12,21;7:5;11:3,7;
13:2,6;17:14;18:14;
19:4,5,10;20:2;21:2;
23:23;27:10,17,21;
28:3;32:6,22;38:21;
39:5,7;49:18;51:6,7,
14;52:14;54:18,19,
22;56:2,3;58:9;61:17;
62:14,16;63:25;64:5;
65:2,13;66:12,12;
67:17
**capacity (2)**
16:19;41:15
**Capital (14)**
10:25;11:4,11,15,
23;12:6,9;13:7;18:18;
19:16,22;43:25;46:2;
63:23
**caption (1)**
9:18
**case (21)**
4:25;6:22;7:8;
10:21;20:20;40:6,7,
12,15,16,20;41:12,20,
23;42:4,9,11,14,17;
60:11;61:4
**cases (3)**
9:12,13,19
**certain (1)**
26:9
**Certainly (1)**
41:14
**certainty (2)**
15:11;25:10
**certification (1)**
3:8
**chain (4)**
26:18,25;27:3,6
**change (2)**
60:2;64:19
**changes (2)**
59:4;64:16
**check (5)**
53:18;54:4;64:24;
65:5,6
**checklist (1)**
51:10
**choice (1)**
40:10
**Civil (1)**
6:13
**claimed (1)**

16:16
**claims (1)**
16:13
**clarification (1)**
43:6
**clear (5)**
18:25;38:11,14,16;
46:22
**commenced (1)**
4:22
**communications (3)**
7:13;43:16;44:7
**companies (2)**
26:4,7
**company (8)**
9:15;12:10,11;
14:17;19:17;26:10;
57:11,14
**Complaint (9)**
8:19;56:17,19,23;
57:5,22;58:3;61:22;
62:21
**complicated (1)**
35:21
**Compound (1)**
33:9
**computer (18)**
23:13;25:8,12;49:2,
5,8,17,24;50:5,6,8,16;
51:2;52:17;54:23;
57:18,20;65:12
**conduct (2)**
9:25;27:7
**confirm (6)**
37:17;60:10;61:3,6,
8;64:12
**confirmed (1)**
58:18
**confirming (1)**
22:15
**confused (2)**
18:21,22
**confusing (1)**
19:3
**connection (5)**
16:23;17:12;31:18;
44:16,20
**consent (1)**
9:23
**constituted (1)**
37:18
**contact (1)**
46:4
**contained (5)**
57:4;58:2;59:6;
61:21;62:20
**contract (17)**
23:8,9,11,13,14,18,
19,20;24:20,25;25:2,
5;52:4,5,8,11,15
**copied (1)**
37:13
**copies (2)**

7:3;47:4
**copy (8)**
21:12;23:12;24:19;
25:4,7;55:15;62:25;
63:11
**Corp (73)**
4:23;13:20,23;14:3,
12,15;15:6,10,24;
16:2,6,9,13,17,20;
17:5,13,16;18:5,18;
19:13,16,21,23;20:4,
11;21:21;22:2,6,7;
25:4;36:16;38:5;
39:20;40:5,10,13;
42:5,11,22,25;43:12,
15;44:3,7,15,20;
45:16;46:8,17;47:17,
22;48:9,15,19,20;
49:25;51:9,22;52:21;
53:16;57:10;58:6,15;
60:5,23;61:10;62:4;
63:8;64:6,10,18;
65:22
**corporate (1)**
16:3
**corporation (4)**
12:10;13:13,17;
25:16
**Corp's (3)**
25:12;52:11;54:17
**correctly (1)**
66:11
**correspondences (1)**
60:25
**counsel (2)**
7:13,16
**Counsellor (1)**
32:21
**course (2)**
7:6,17
**Court (3)**
3:19;4:23;58:17
**created (1)**
53:3
**criteria (1)**
51:19
**Crosby (32)**
10:25;11:4,10,14,
23;12:6,9;13:7,21,22,
24;14:5,7,11,14;15:3,
23,25;16:21;17:4;
18:4,18;19:15,22;
36:6,11;40:25;41:16;
43:24;46:2,7;47:18
**current (2)**
10:23;11:10
**currently (1)**
10:10;13:12
**custodian (6)**
17:25;21:7,7;62:5,
6,10
**custodians (1)**
12:4

**cut (2)**
32:7,22
**cutting (1)**
32:5

**D**

**D'Aguesseau (1)**
4:16
**Daily (1)**
8:10
**Danielle (3)**
9:16,17;55:13
**database (1)**
25:12
**date (3)**
45:2;48:7;59:18
**dated (1)**
58:17
**day (2)**
8:9,10
**days (1)**
7:9
**decide (2)**
45:9;46:6
**decided (1)**
46:16
**decides (3)**
42:7;46:11;47:17
**decision (4)**
46:12,14;47:14;
58:16
**deem (1)**
27:8
**default (1)**
45:2
**defendant (5)**
4:21;58:18,20;
59:25;64:19
**Defendant's (2)**
55:11;58:22
**define (1)**
17:14
**definitely (1)**
41:7
**definition (3)**
5:23;6:2,3
**Delaware (1)**
57:11
**demand (2)**
54:9;62:25
**demo (1)**
31:15
**depends (2)**
20:22;47:8
**deposed (1)**
9:5
**deposition (15)**
3:16;5:2;6:25;7:6,
12,14,23;8:3,15,21;
9:21;10:6,16;16:25;
48:4
**depositions (2)**

10:2;27:14
**describe (3)**
13:19;17:20;44:18
**described (1)**
47:2
**designated (1)**
12:16
**detail (1)**
44:18
**detailed (1)**
45:13
**Devico (3)**
15:22;16:24;38:8
**Devico's (1)**
44:10
**different (7)**
11:18,24;27:4,20;
48:9;51:9;60:14
**difficult (2)**
32:14;47:21
**diligence (1)**
45:4
**direct (3)**
56:21;62:15;63:22
**directing (1)**
42:12
**directly (1)**
50:21
**disclosed (1)**
26:22
**disclosure (1)**
26:23
**discussed (1)**
6:10
**discussion (2)**
28:5;40:2
**District (1)**
4:23,24
**divulging (1)**
7:24
**document (34)**
7:4,7,9;17:4,8,9;
21:2,13,20;33:4,12,
14;41:19;54:9,24;
55:2,12,20;56:4,6,8,
11,13,16,22;57:2,24;
61:19;62:18;63:5,16;
65:17;66:3,14
**documents (55)**
7:2;8:14,17;12:2,4;
17:24;20:19,22,24;
21:5,6,8,14,18;22:2,3,
8,13;24:3,7,10,11,13,
15;31:19,23;32:13;
37:16,19,20,23,24;
38:6;45:5,9,11;46:18,
20,24;47:5,11;49:16;
50:2,7,9,11,12,15,24;
52:18;54:17;55:5;
64:11;65:10,13
**done (19)**
11:19;14:16;15:2;
17:18;23:15;31:14;

49:23;50:12;51:10;
55:7;56:24;57:23;
60:11,14;61:4,7,7,9;
64:14
**dots (2)**
67:20,24
**doubt (1)**
25:6
**download (1)**
21:12
**downloaded (1)**
50:10
**Dreambuilder (3)**
30:15,20;31:2
**drive (4)**
49:3,4;50:4;58:12
**drop (6)**
45:8;47:10;49:10,
13,19;50:13
**drugs (1)**
10:11
**due (2)**
45:4;64:13
**duly (2)**
4:3,8
**During (3)**
7:6,16;10:15
**duties (2)**
11:22;17:12

**E**

**earlier (4)**
12:7;24:16;59:20;
61:25
**easier (2)**
5:13;55:18
**Eastern (1)**
4:24
**effect (2)**
3:18;6:8
**Eileen (1)**
58:22
**Eitan (1)**
4:14
**either (2)**
25:3;31:14
**Electronic (4)**
28:2,9,13,19
**electronically (1)**
49:13
**else (8)**
8:12;15:12;39:22;
50:18;54:24;57:19;
60:18,20
**email (21)**
16:15;37:8,10,12,
14,17;41:24;42:8,12;
43:25;44:4,11;45:17,
22;46:3;47:7;49:10,
14,22;51:6;61:13
**emails (8)**
7:16;41:10,13;

43:22,24;44:9,11;
50:10
**employed (14)**
15:3;16:16;25:14;
27:24;28:8,21;29:10,
24;30:14;31:4;34:7,
21;35:14,18
**employees (1)**
16:10
**employer (2)**
6:9;10:24
**employment (3)**
10:19,20;31:8
**end (2)**
10:6;39:17
**English (2)**
4:4,5
**entirely (5)**
57:5;58:3;59:7;
61:22;62:21
**entirety (1)**
37:18
**entities (1)**
27:20
**entitled (1)**
63:24
**entity (5)**
20:14;34:25;46:7,8;
52:20
**entry (1)**
61:14
**establish (1)**
5:4
**even (2)**
12:23;27:13
**event (1)**
20:7
**everyone (2)**
39:21,22;55:17
**evidenced (1)**
67:24
**exact (1)**
59:18
**exactly (8)**
9:4;36:25;40:9;
42:17;49:6,12;51:4;
54:7
**EXAMINATION (2)**
4:11;7:17
**examined (1)**
4:9
**example (6)**
20:4;21:11;23:17;
43:19;53:23;61:10
**excel (1)**
44:23
**except (2)**
3:12;6:22
**exchanged (1)**
43:22
**execution (2)**
46:12;51:21
**Exhibit (3)**

55:12,15;63:4
**exists (2)**
7:7;17:9
**explain (2)**
35:25;41:9
**explained (5)**
7:21;17:22,23,24;
18:3
**explaining (1)**
18:4

**F**

**fact (2)**
40:21;58:16
**factually (5)**
57:6;58:4;59:7;
61:23;62:22
**Fair (4)**
13:2;14:25;50:15;
65:9
**fairly (1)**
26:8
**false (1)**
6:8
**falsely (1)**
6:7
**familiar (2)**
26:12;44:14
**familiarity (21)**
25:18,23;28:11,17;
29:2,6,15,20;30:4,10,
19,24;32:2,11;34:2,
11,17;35:4,9;38:25;
39:13
**far (2)**
26:23;37:6
**FCI (42)**
13:25;14:5;24:8,16,
22;31:5;32:4,11,18,
24,24;33:4,12,13,18,
20,24;34:5;35:23;
37:4,11,12;39:7,9;
40:7,12,17;41:19,23;
42:6,8,12,18;43:8,10,
12;50:11;53:13,14,15,
17;65:11
**FCI's (2)**
37:18;41:23
**Federal (3)**
5:19,23;6:13
**few (1)**
5:4
**figure (2)**
10:4;12:17
**file (4)**
37:18;49:2;52:18;
60:25
**files (2)**
52:14,16
**filing (1)**
3:8
**Finally (1)**

7:11
**Financial (14)**
24:17;34:23;35:2,6,
12,15;36:17,22;37:5;
39:3,15;52:24;53:3;
65:12
**find (11)**
23:6,12;31:20;
42:16,25;43:11;
49:15,20;51:5,7;52:3
**fine (3)**
6:4;56:5;57:25
**fined (1)**
5:19
**finish (1)**
5:6
**finished (1)**
62:17
**firm (2)**
9:19;10:4
**first (15)**
4:8;5:4;6:23;29:25;
30:6,12;36:3,10,13,
21;40:25;44:22;
46:22;55:22;56:10
**fit (1)**
27:8
**five (2)**
5:20;13:15
**Florida (1)**
11:9
**follows (1)**
4:10
**font (1)**
55:21
**force (1)**
3:18
**foreclosure (16)**
4:22;6:10;17:25;
20:13;21:22;31:24;
40:6,11,16;41:21;
42:4,5,13;47:24;
51:24;52:22
**form (3)**
3:12;6:16;66:22
**forth (1)**
18:22
**forward (2)**
5:22;39:24
**forwarded (1)**
7:3
**foundation (1)**
22:21
**four (2)**
36:7;62:14
**Fourth (1)**
5:16
**France (1)**
4:17
**French (6)**
4:2,4,5;14:19,23;
48:16
**full (3)**

10:15;11:7;63:25
**fully (1)**
5:17
**FURTHER (4)**
3:11,15;7:15;38:14

**G**

**Gary (3)**
4:21;58:11;64:3
**gave (1)**
9:10
**general (6)**
19:14;21:19;24:12;
42:3;50:23;62:7
**Generally (7)**
9:11;23:10;42:10;
46:15;54:18,20;60:7
**gets (1)**
21:17
**given (2)**
5:18;48:12
**Good (2)**
4:18;57:3
**granting (1)**
17:8
**Greenwich (3)**
34:8,13,18
**ground (1)**
5:4
**Group (20)**
4:20;21:8;22:2,8,
13;23:2,21;24:5,14,
22;40:15;48:8,10,11,
13,16;62:2;63:6;
65:22;67:10
**Group's (1)**
48:7
**guarantee (1)**
51:7
**guess (1)**
55:17
**guilty (1)**
5:21

**H**

**half (1)**
8:22
**happened (2)**
23:17;42:17
**hard (1)**
67:18
**harder (1)**
49:23
**head (3)**
53:21;63:7;65:5
**heading (1)**
63:5
**headquarters (1)**
16:3
**hear (1)**
55:8

**heard (1)**
32:9
**held (7)**
13:16;28:5;37:3;
40:2;62:8,11;67:2
**help (2)**
36:20;39:8
**helpful (1)**
45:14
**HEREBY (2)**
3:6,9
**herein (2)**
3:7;4:3
**Heritage (3)**
58:20;64:4,6
**Hills (3)**
58:21;64:4,6
**hire (1)**
42:12
**hired (4)**
40:13;42:8,22;
43:12
**history (2)**
10:20;45:6
**hold (2)**
12:5;13:12
**holders (1)**
64:20
**holes (2)**
67:16,17
**Home (14)**
24:17,23;35:15,19;
36:16,22;37:5,12,12;
34:4,23;39:3,15;
65:12
**honest (1)**
9:25

**I**

**ID (11)**
55:21,23;56:22;
61:17;62:14;63:16,
20;65:15;67:6,25,25
**identify (2)**
7:4;33:6
**impaired (1)**
10:11
**implement (1)**
19:24
**imprisoned (1)**
5:20
**Inc (19)**
28:2,9,14,19;31:6;
32:4,12,18,24;33:5,
13,14,19;34:5,23;
35:16;37:5;39:4,15
**include (1)**
20:13
**included (1)**
47:6
**incorrect (1)**
6:7

**incorrectly (1)**
6:7
**index (1)**
9:19
**individual (1)**
4:20
**influence (1)**
10:11
**information (19)**
7:25;15:13;20:11;
23:6;31:21;32:19;
33:20;43:2;44:14,19,
24;46:5;49:21;50:14;
52:3;58:7;60:8;61:11;
64:12
**informed (2)**
8:20,24
**informing (1)**
41:25
**initial (1)**
46:19
**initiated (1)**
40:20
**instead (1)**
6:6
**instructing (1)**
66:15
**instructs (1)**
6:19
**interest (2)**
44:25;64:12
**interested (1)**
45:2
**internal (3)**
32:11;52:14;65:7
**internet (2)**
21:11,15
**interpret (2)**
4:3;26:14
**interpreter (10)**
4:3;5:6,14;14:21,
21;15:16,17;32:8,9,20
**interruption (1)**
38:20
**intervene (1)**
23:15
**into (4)**
4:4,5;23:20;46:12
**introduce (1)**
55:11
**Investments (3)**
30:16,21;31:2
**Investors (3)**
34:9,13,19
**involving (2)**
18:17;39:19

**J**

**job (2)**
11:21;17:16
**judgment (1)**
58:25

**Justin (2)**
4:19;12:21

**K**

**keep (1)**
21:9
**keeping (1)**
19:25
**kept (2)**
21:6;60:13
**kind (1)**
54:23
**knew (1)**
19:18
**knowledge (25)**
5:17;25:18,22;
28:11,16,25;29:5,14,
19;30:4,9,18,23;32:2,
10;34:2,11,16;35:4,9;
38:25;39:12;44:13;
58:16;61:5
**Korb (76)**
4:14,18;5:1;6:1;
7:1;8:1;9:1,20;10:1,
10;11:1;12:1;13:1;
14:1;15:1;16:1;17:1;
18:1;19:1;20:1;21:1;
22:1;23:1;24:1;25:1;
26:1;27:1,14;28:1;
29:1;30:1;31:1;32:1;
33:1,22;34:1;35:1;
36:1,15;37:1,13;38:1;
39:1,21;40:1,5;41:1;
42:1,20;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1,14;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1,23;
67:1

**L**

**labeled (1)**
67:25
**Land (14)**
24:17,23;35:15,19;
36:16,22;37:5,12,12;
38:4,23;39:3,15;
65:12
**language (1)**
5:11
**laptop (1)**
56:9
**large (1)**
67:20
**last (3)**
13:15;36:7;55:22
**Law (3)**
4:19;5:19;63:6
**lawsuit (4)**

**4:22;6:10;8:3,6**
**lawyer (3)**
8:25;42:7,8
**lawyers (9)**
11:25;40:14;41:22,
24;43:9,10,23;50:12;
65:14
**learn (2)**
41:18;59:24
**least (2)**
58:19,24
**leave (1)**
19:17
**legal (1)**
12:24
**Legally (1)**
66:19
**Lend (3)**
25:15,20,24
**Lender (13)**
31:5;32:4,12,18,24,
25;33:4,12,13,18;
34:5;37:4;59:3
**letter (3)**
41:24;61:11;62:25
**liability (2)**
12:9,11
**light (1)**
58:8
**limit (1)**
19:7
**limited (2)**
12:9,11
**Lincoln (3)**
29:25;30:6,12
**Lindor (2)**
58:22,23
**line (2)**
23:24;39:18
**list (3)**
10:7;26:8,10
**little (11)**
8:10;11:16;20:2;
31:7,8,10;32:6,21;
38:20;45:23;51:18
**LLC (27)**
12:11,12,14,18,23;
13:10,13,17;28:23;
29:3,8,12,17,22;30:2,
7,12,16,21;31:2;34:9,
14,19;35:2,7,12;52:25
**LLC's (1)**
12:23
**loan (47)**
14:3;16:21;20:12,
13;22:6;23:5;24:4,13,
14,17,21;28:22;29:3,
8;30:2,6,12;31:23;
32:13,17,23;33:15,17;
37:4;44:16,21,23;
47:16,23;50:25;51:9,
11,15,23;52:21;53:4,
7,10,12;59:25;60:25;

**61:10;64:8,14,21;**
65:10,11
**loans (3)**
13:24;17:23;60:15
**locate (3)**
24:15;52:10;65:10
**located (3)**
11:2;20:21;48:25
**location (1)**
37:21
**log (8)**
32:19;54:25;60:13;
61:6,8,12,14,16
**logs (1)**
32:25
**long (6)**
11:14;31:25;32:21;
36:14,24;61:7
**look (12)**
44:8;51:6;52:14;
55:7,20;56:24;57:18,
22;60:9;61:13;64:10;
65:7
**looking (2)**
20:25;41:6
**looks (3)**
63:19;67:17
**lost (1)**
16:23
**lot (3)**
17:22;50:9,13

**M**

**mail (12)**
25:23;28:17;29:6,
20;30:10,24;34:3,17;
35:10;39:13;49:11;
61:15
**mailed (2)**
33:4,12
**mailing (1)**
64:19
**makes (1)**
46:14
**making (12)**
25:19;28:12;29:2,
15;30:5,19;32:3;
33:24;34:12;35:5;
39:2;46:13
**management (2)**
14:10;32:13
**manager (8)**
11:13,17,22;14:5,8;
15:14,19;17:17
**manages (3)**
13:24;14:15;16:21
**managing (1)**
13:3
**manner (1)**
23:5
**many (2)**
11:24;24:9

**March (3)**
58:19,21,24
**Margolin (14)**
40:7,11,12,16;
41:11,20;42:5,12,22;
43:12;63:6,9,10,12
**mark (1)**
67:15
**matters (1)**
9:9
**may (8)**
3:16;5:19;6:8,15,
25;7:7;50:25;58:7
**Maybe (5)**
15:14,18;21:2;52:9;
64:8
**mean (4)**
14:24;21:25;54:19;
60:24
**meaning (1)**
14:20
**means (3)**
15:7;22:3;43:21
**meant (1)**
48:15
**meet (2)**
8:2,5
**Melville (1)**
58:12
**member (2)**
12:12;13:10
**members (3)**
13:3,4,4
**memorializes (1)**
52:5
**memory (1)**
36:21
**mentioned (6)**
12:7;24:16;47:3;
51:3;54:13;67:15
**Meridian (1)**
11:8
**messages (1)**
7:16
**method (1)**
19:24
**Miami (2)**
11:6,8
**Michael (3)**
26:13;27:10;33:11
**might (2)**
43:9;65:2
**missing (1)**
12:4
**model (1)**
19:24
**moment (1)**
55:25
**Monroe (16)**
21:7;22:2,8,13;
23:2,20;24:5,14,22;
25:2;50:11;61:25;
62:10;65:22;67:2,9

**month (2)**
8:22;36:13
**monthly (3)**
47:6;53:11,17
**months (1)**
8:23
**more (11)**
5:20;11:3,16;18:25;
19:20;20:2;26:3;39:5;
46:11;51:13;58:10
**mortgage (31)**
8:18,19;14:4;20:12;
21:4,5,11;22:24;
27:25;28:9,13,19;
29:11,17,22;33:2,6;
45:5,6;47:4,6,23;
51:23;52:21;53:6,24;
58:23;63:18,20;
64:11,21
**mortgages (1)**
20:20
**move (1)**
39:23
**moving (2)**
5:22;6:5
**much (3)**
23:4;26:15;51:22
**must (5)**
5:9;36:7;42:18;
49:9,12
**myself (1)**
60:19

**N**

**name (12)**
4:13,18,20;9:12;
10:23;15:22;20:14;
22:12;34:25;47:15;
52:20;62:10
**named (2)**
4:21;48:19
**names (4)**
9:9;26:7,10,19
**narrow (1)**
32:16
**necessarily (1)**
14:23
**need (2)**
6:4;27:15
**needed (2)**
21:11;44:24
**New (8)**
4:9,24;25:16;58:7,
12,21;64:4,7
**None (1)**
17:22
**nonperforming (1)**
17:23
**normally (1)**
60:17
**Notary (1)**
4:8

**note (15)**
8:18;21:19,22;
23:25;47:4;53:6;62:3,
9,12;64:11,17;65:24;
67:2,12,21
**noted (1)**
59:13;66:5,22
**notice (1)**
59:25;60:11;64:19
**notices (1)**
60:6
**notify (1)**
59:3
**noting (2)**
23:23;46:9
**number (12)**
4:25;9:19;33:15;
55:21,23;56:22;
61:17;62:14;63:16,
20;65:16;66:13

**O**

**oath (2)**
3:17;5:18
**object (2)**
18:6,19
**objection (20)**
6:16,16;19:5,8;
23:7,22,24;24:24;
33:8;46:10;47:19;
51:12,25;57:9;59:9,
13;64:22;65:25;66:5,
21
**objections (2)**
3:12;6:14
**obtained (2)**
44:15,19
**occur (1)**
31:11
**Ocwen (3)**
28:22;29:3,8
**off (7)**
28:3,6;32:5;39:25;
40:3;53:21;63:7
**offer (4)**
45:3,3;46:21,23
**office (14)**
11:2,5;16:3;25:23;
28:17;29:6,20;30:10,
24;34:3,17;35:10;
39:13;54:9
**officer (7)**
3:17;12:14,15,22;
15:5,7,9
**officers (2)**
12:24;13:5
**Once (2)**
9:6;26:15
**one (19)**
9:7;15:17;17:10;
20:25;21:2;26:7,11;
27:12;33:18;40:13;

43:6;45:21;46:11;
48:18;51:14;59:14;
63:19;65:11;67:6
**ones (1)**
53:20
**Only (5)**
9:7;36:6;48:18;
50:4;52:16
**opened (1)**
55:2
**operate (2)**
16:2,7
**operates (1)**
16:6
**operating (2)**
12:18;13:8
**operations (1)**
18:17
**opportunity (2)**
8:2;39:21
**order (2)**
46:25;58:16
**orders (1)**
12:3
**original (10)**
21:8;40:6;43:4;
62:2,9,12;65:23;67:2,
11,12
**otherwise (3)**
10:12;49:23;60:7
**out (13)**
10:5;16:2;23:6;
36:3,21;42:16,25;
43:11;49:15,20;51:5;
52:3;55:18
**outside (1)**
7:13
**over (4)**
46:18,20;47:4;
55:17
**own (2)**
52:19;65:12
**owner (1)**
54:2

**P**

**page (17)**
55:21,22,22,23;
56:22,22;61:17;
62:14;63:16,19,20,23;
65:15;67:6,21,25,25
**pages (8)**
66:9,14;67:5,11,15,
16,21,24
**paid (1)**
23:4
**PANE (19)**
4:12,19;9:17;13:2;
14:25;18:12;19:4;
26:13,21;27:4,23;
28:3;33:10;39:17;
59:13;65:2;66:5,15,

21
**paragraph (14)**
56:23;57:5,21;58:3,
11;59:5,6;61:18,22;
62:15,21;63:24;64:2,
2
**Parker (4)**
4:21,21;58:11;64:3
**particular (4)**
42:4,11;60:14;61:4
**particularly (1)**
42:21
**parties (1)**
3:7
**party (1)**
26:22
**pause (1)**
27:21
**pay (1)**
45:6
**payment (3)**
32:17,23,25
**payoff (1)**
45:7
**penalties (1)**
5:18
**pending (1)**
6:22
**people (1)**
5:8
**perform (1)**
17:13
**perjury (3)**
5:19,21,24
**person (1)**
15:15
**persons (1)**
20:6
**phrased (3)**
66:7,8,17
**physical (6)**
11:5;62:2,4,8,11;
67:10
**physically (1)**
65:23
**pieces (2)**
32:7,22
**place (4)**
20:5,25;35:22;40:4
**places (1)**
65:10
**plaintiff (1)**
6:9
**platform (9)**
21:10,12;24:9,9;
31:13,18,21;35:25;
65:11
**please (26)**
4:13,15;5:5,13,16;
6:12,23;7:5;11:3,7;
17:14,20;19:8,10;
20:3;27:17;32:7,22;
39:5;41:9;44:18;

57:21;61:17;65:15;
66:4,23
**plural (1)**
14:24
**point (3)**
13:2;59:14,16
**policies (1)**
18:23
**portal (6)**
37:25;38:3,9,12,19,
23
**position (2)**
11:25;13:16
**positions (2)**
12:6;13:13
**possess (2)**
53:2;65:23
**possession (5)**
62:2,4,9,11;67:10
**possible (2)**
24:10;65:4
**Poulonge-Billancourt (1)**
4:17
**practice (2)**
20:5;60:22
**practices (23)**
19:25;25:19,24;
28:12,18;29:2,7,16,
21;30:5,11,20,25;
32:3,11;33:24;34:4,
12,18;35:5,11;39:2,14
**precise (4)**
9:12;11:3;20:3;
39:5
**premises (1)**
58:23
**preparation (3)**
7:23;8:15;48:4
**prescribed (1)**
10:11
**presence (1)**
7:14
**present (1)**
8:12
**pretty (1)**
12:24
**principal (9)**
15:14,18,20,21,23;
16:22;19:12;40:23;
44:25
**print (1)**
55:18
**printed (1)**
55:2
**prior (11)**
27:14;47:5;53:7,10,
12,25;54:2,10;59:22,
25;64:20
**privilege (1)**
7:25
**probably (6)**
10:3;15:13;25:9;
31:25;37:15;42:14

**problem (1)**
19:2
**Procedure (4)**
6:13;41:23;42:3;
51:15
**procedures (24)**
18:4,8,11,23;19:25;
25:20;28:13,18;29:3,
7,16,21;30:6,11,20,
25;32:4;33:24;34:4,
13;35:6,11;39:3,14
**process (6)**
33:5,19;44:14,19;
45:4;51:8
**produce (2)**
7:8;9:18
**promise (1)**
49:18
**promissory (1)**
65:24
**property (1)**
58:19
**provide (2)**
10:15;20:10
**providing (1)**
8:21
**PT (93)**
4:22;13:20,21,22,
24;14:3,12,15;15:6,
10,24;16:2,6,9,13,17,
20;17:5,13,16;18:5,
18;19:13,16,21,23;
20:4,11;21:21,25;
22:6,7;25:4,11;36:16;
38:5;39:19;40:5,10,
13,15,18;41:16;42:5,
11,21,25;43:12,15;
44:3,7,15,20;45:12,
16;46:7,16;47:17,22;
48:6,8,9,10,11,13,15,
19,24;49:25;50:16;
51:8,22;52:11,15,21;
53:16;54:16,24;
57:10;58:6,15;60:5,
23;61:10;62:3,6;63:8,
11;64:6,10,18;65:8,22
**PT's (2)**
24:20;53:25
**Public (1)**
4:8
**pulled (1)**
59:2
**punch (1)**
67:15
**purchase (13)**
23:25;24:20;44:16,
21;45:10;47:22;51:8,
16,17,20,23;52:6;
53:25
**purchased (5)**
20:14,15;52:21;
53:4,15
**purchasing (2)**

**put (3)**
21:10;49:7;61:12

# R

**rate (2)**
44:25;64:12
**rather (1)**
46:12
**reached (2)**
36:3,21
**read (8)**
5:23;6:2,3;56:23;
57:21;61:18;62:16;
63:25
**reading (7)**
56:25;57:2,24;59:5;
61:19;62:17,18
**reads (1)**
67:6
**ready (1)**
55:8
**real (2)**
11:12;35:23
**really (7)**
11:20;12:7;14:20;
19:2,3;26:17;31:12
**reason (1)**
10:14
**recall (9)**
9:9;17:6,7,9,10;
36:5;49:12;51:3;
56:12
**receive (2)**
50:14;60:8
**received (23)**
16:15;17:11,21;
18:16;19:11;25:15;
27:25;28:8,22;29:11,
25;30:15;31:5;34:8,
22;35:15,19,20;45:11,
21,24;49:16;55:14
**receiving (10)**
25:24;28:18;29:7,
21;30:11,25;34:4,18;
35:11;39:14
**recess (1)**
40:4
**recipient (1)**
59:3
**record (19)**
4:13;5:14;19:25;
20:6;22:25;25:19;
28:3,6,12;29:15;30:5,
19;32:19;33:23;
34:12;35:5;39:2,25;
40:3
**recording (1)**
32:3
**records (25)**
20:17,18,21;23:16;
25:12;32:25;37:3;

**42:19,21;43:15;48:3,**
5,23,25;52:11,19;
53:2;57:16,17;58:7;
60:4,10;64:7,19;65:8
**red (1)**
55:21
**refer (7)**
40:5,7,10,12,16;
42:5;61:18
**referred (1)**
41:19
**reflects (1)**
24:20
**refresh (1)**
36:20
**regard (1)**
61:9
**regarding (8)**
20:11,19;23:25;
24:4,13;27:2;31:13;
64:16
**Registration (4)**
28:2,9,14,19
**regular (1)**
61:15
**related (5)**
31:23;37:4;44:4;
49:25;50:25
**relates (3)**
10:20;33:6,15
**relating (2)**
50:16;65:10
**relationship (1)**
13:19
**relevance (2)**
45:19;47:20
**relevancy (1)**
9:24
**relevant (1)**
26:22
**rely (1)**
65:9
**relying (1)**
63:12
**remember (3)**
49:6;52:9;65:4
**remote (1)**
7:11
**repeat (2)**
22:5;38:21
**rephrase (6)**
6:12;13:6;18:13;
19:7,10;67:19
**reporter (3)**
5:7,10,14
**represent (1)**
4:20
**represented (3)**
9:13,20;54:10
**representing (1)**
9:14
**request (3)**
6:21;10:8;24:12

**requested (2)**
16:22,24
**required (1)**
6:18
**reserved (1)**
3:13
**resided (3)**
58:18,20,23
**respect (6)**
32:12;57:6;58:4;
59:8;61:23;62:22
**respective (1)**
3:7
**respond (1)**
10:9
**response (3)**
48:12;54:8;62:7
**responsibilities (1)**
11:21
**responsive (1)**
5:10
**restart (1)**
59:2
**restricted (1)**
6:15
**retained (1)**
41:25
**review (5)**
8:14,17;37:16;55:7,
25
**reviewed (4)**
37:19;48:3,12;56:2
**Reviewing (1)**
56:4
**reviews (1)**
54:16
**Richmond (9)**
21:7,15,17,20;22:4;
25:2;62:10;67:2,9
**right (10)**
42:23;43:4,7,8;
55:21;57:18;59:16;
60:12;64:25;66:18
**rights (1)**
33:17
**round (1)**
67:20
**Roundtree (1)**
58:12
**Rue (1)**
4:16
**ruled (1)**
58:17
**rules (1)**
5:4;6:13;7:20

# S

**safe (2)**
21:9;45:11
**safeguarded (1)**
21:6
**same (15)**

**3:9,18;5:8;7:3;**
9:15;11:19;14:9;
15:15;26:3;27:19;
35:23;39:9,10;51:15;
54:5
**save (1)**
49:7
**saved (2)**
25:7;49:5
**saves (1)**
33:14
**saw (1)**
56:10
**saying (2)**
37:8;62:3
**scan (1)**
21:9
**scanned (1)**
23:20
**scenarios (2)**
33:23;39:8
**scope (1)**
59:11
**screen (2)**
54:23;55:16
**sealing (1)**
3:8
**search (8)**
20:16,17;44:6;
49:22;60:4,10,17,24
**searches (1)**
60:14
**searching (1)**
21:3
**Second (3)**
5:9;28:4;36:13
**secure (3)**
37:21;38:9,24
**secured (7)**
37:23,25,25;38:3,
12,19,23
**seeing (1)**
17:10
**sell (2)**
44:23;45:25
**seller (18)**
21:19,21;22:4,7,12,
19;44:22;45:4,15,17;
46:18,20;47:3,9,12;
50:17;60:8;64:9
**selling (1)**
23:11
**send (15)**
10:7;22:2,7;31:15;
41:24;42:8,11;45:2,4;
46:2;47:4;55:19;
61:10;63:11,13
**sending (10)**
25:23;28:17;29:6,
20;30:10,24;34:3,17;
35:10;39:13
**sends (6)**
21:19;44:22;45:8;

46:18,20;63:10
**Seneca (3)**
　29:11,16,22
**sent (25)**
　16:15;21:8;22:3,13;
　37:10;43:24;45:17;
　46:24;47:11;49:9,19;
　50:11,17,21;53:11,13;
　55:2,12,17;59:25;
　61:15;63:9,13;64:9;
　65:14
**separate (1)**
　49:24
**September (2)**
　47:25;58:17
**series (1)**
　26:3
**server (1)**
　13:23
**serviced (2)**
　32:17,23
**servicer (15)**
　13:21,25;14:6,7,9;
　17:25;24:8,10,14,17;
　33:18;36:17;41:22;
　59:25;65:11
**servicers (8)**
　12:3;14:4;24:25;
　27:5;30:2;37:9;53:12;
　64:21
**Services (28)**
　24:18;30:7,12;31:6;
　32:4,12,18,24,25;
　33:5,13,14,19;34:5,
　23;35:2,7,12,16;
　36:17,22;37:4,5;39:4,
　15;52:25;53:4;65:12
**servicing (13)**
　14:11;28:23;29:3,8,
　12,17,22;32:13;
　33:17;53:7,10,17;
　59:21
**shall (1)**
　3:13
**share (1)**
　55:16
**shared (2)**
　49:3;50:4
**shareholder (3)**
　15:5,8,10
**sheet (1)**
　44:23
**shot (1)**
　26:11
**show (2)**
　6:25;55:5
**showed (1)**
　17:24
**shown (1)**
　7:4
**shows (1)**
　54:25
**side (1)**

42:21
**signed (3)**
　3:16,18;52:15
**Similar (1)**
　39:6
**similarly (1)**
　48:19
**slowly (1)**
　5:13
**solely (1)**
　49:25
**solution (1)**
　26:17
**solve (1)**
　31:15
**somebody (3)**
　16:16;50:17;60:18
**someone (4)**
　15:12;16:12;17:15;
　54:24
**someplace (1)**
　57:19
**Somers (3)**
　58:21;64:4,7
**somewhere (1)**
　61:12
**sorry (6)**
　12:20;14:19;15:16;
　20:8;32:20;53:9
**sort (1)**
　25:8
**sounded (1)**
　50:23
**speak (4)**
　5:13;8:2,5;17:4
**speaking (2)**
　5:8;6:14
**specific (6)**
　7:24;19:20;33:23;
　39:18;46:25;58:10
**specifically (4)**
　6:19;42:3;50:24;
　62:8
**specifics (1)**
　39:7
**specify (1)**
　59:10
**spoke (1)**
　8:12
**spoken (2)**
　5:15;16:12
**spreadsheet (7)**
　45:15,17;46:19,22;
　48:6,13,22
**spreadsheets (2)**
　45:22,24
**standard (12)**
　25:23;28:17;29:6,
　20;30:10,24;34:3,17;
　35:10;39:13;49:11;
　60:22
**standardized (2)**
　19:24;20:5

**start (10)**
　5:3;20:25;21:3;
　41:11,20,21;42:13;
　45:3,15;56:3
**started (3)**
　17:19;36:10;40:25
**State (7)**
　4:8,13,15;6:16;7:7;
　19:4;66:13
**statement (1)**
　41:5
**statements (9)**
　47:6;53:8,11,11,17,
　25;54:6,10;59:21
**States (1)**
　4:23
**step (1)**
　44:22
**still (4)**
　6:17;20:8;35:3;
　36:24
**STIPULATED (3)**
　3:6,11,15
**stop (1)**
　59:17
**stopped (1)**
　59:15
**stored (2)**
　44:15,20
**subject (5)**
　5:2;20:12;47:23;
　51:24;52:22
**suggestion (1)**
　27:9
**support (1)**
　46:18
**sure (16)**
　8:22;11:25;13:10;
　15:8,11;18:21;19:11;
　21:4;27:10;41:10;
　45:18;52:12;54:13;
　55:14;59:21;64:15
**surprised (6)**
　36:15,19;41:18;
　54:13;59:24;60:3
**sworn (4)**
　3:16,18;4:3,8
**system (2)**
　23:21;25:8
**Systems (4)**
　28:2,9,14,19

**T**

**talking (5)**
　18:7;20:23;48:18;
　59:12;63:18
**tape (1)**
　64:8
**teach (1)**
　17:15
**telling (2)**
　42:9;63:13

**tells (1)**
　41:4
**ten (3)**
　7:9;26:3;27:20
**tenants (1)**
　58:22
**terms (1)**
　64:17
**testified (2)**
　4:9;59:20
**testify (1)**
　9:3
**testifying (1)**
　16:19
**testimony (4)**
　5:18;8:6,21;9:10
**texts (1)**
　41:11
**Third (1)**
　5:12;36:13
**though (1)**
　27:13
**thought (1)**
　64:23
**three (24)**
　9:8;11:16;17:19;
　26:3;27:19;36:7,25;
　40:25;57:21;58:3,11;
　59:5,6;61:18;65:9;
　66:8;67:7,7,7,7,10,14,
　16,21
**three-page (3)**
　65:17,24;66:2
**Throughout (1)**
　6:25
**thus (1)**
　26:23
**times (1)**
　15:3
**title (7)**
　11:10,12,18,20;
　12:8,16;13:16
**titles (2)**
　12:5;13:12
**today (9)**
　5:7,18;6:10;8:3,7;
　9:3,14;16:20;56:14
**today's (4)**
　5:2;7:23;8:15,21
**told (3)**
　40:23;41:19;61:25
**took (1)**
　40:4
**top (7)**
　53:21;55:20;63:7;
　65:5;67:16,21,24
**touched (1)**
　54:25
**tracking (2)**
　41:7,9
**trained (1)**
　19:14
**training (30)**

17:11,14,18,20;
　18:9,16,24;19:11;
　25:15;27:25;28:8,22;
　29:11,25;30:15;31:5,
　9,10,11,12,17,22;
　34:8,22;35:15,19,20,
　21,22,24
**transcribe (2)**
　5:7,10
**transcript (1)**
　64:25
**transfer (3)**
　37:9;49:10;53:5
**transferred (7)**
　33:18;37:5,11;
　50:20,22;53:3;60:5
**translate (1)**
　27:11
**translator (2)**
　27:13,15
**trial (1)**
　3:13
**Trinity (9)**
　22:14,16,18;34:22;
　35:2,6,12;52:24;53:3
**true (5)**
　57:5;58:3;59:7;
　61:22;62:21
**trust (1)**
　60:7
**try (3)**
　6:12;49:18,20
**trying (2)**
　6:6;27:9
**turn (2)**
　62:14;65:15
**two (15)**
　5:7;8:12,22;9:8;
　14:3;32:5,22;36:25;
　37:9;56:22,23;57:5;
　67:7,15,20
**type (1)**
　35:20

**U**

**unable (1)**
　16:8
**under (5)**
　5:18,19;6:13;10:10;
　48:23
**underlies (1)**
　21:22
**underlining (1)**
　31:24
**underlying (3)**
　47:23;51:23;52:22
**Understood (3)**
　13:11;19:19;31:16
**unit (1)**
　49:4
**United (1)**
　4:23

**unless (2)**
6:18;66:10
**up (7)**
26:2,25;33:10;
36:17;55:8;56:24;
57:22
**update (1)**
58:6
**upload (1)**
21:18
**uploaded (1)**
21:15
**uploads (1)**
33:7
**upon (1)**
46:23
**USB (1)**
49:19
**use (4)**
14:8;19:17;31:20;
51:15
**used (3)**
31:22;36:16;48:17
**using (1)**
31:17
**Usually (3)**
12:16,18;13:3
**utilized (21)**
25:20,24;28:13,18;
29:3,7,16,21;30:6,11,
20,25;32:4;33:20;
34:4,13,18;35:6,11;
39:3,14

**V**

**vague (4)**
20:2,8;32:6;45:23
**verbal (1)**
5:9
**verify (2)**
41:3,5
**viewing (1)**
31:19
**virtually (1)**
67:18
**visible (1)**
37:20

**W**

**wait (1)**
5:5
**waived (1)**
3:9
**wants (1)**
44:23
**way (13)**
22:15;27:2,8;41:3;
42:16;49:15;51:5;
52:10;54:15;60:9;
61:3;66:7,17
**ways (1)**

50:13
**website (4)**
24:5,14,22,22
**week (1)**
8:8
**Weinreb (14)**
40:7,11,12,16;
41:11,20;42:6,13,22;
43:13;63:6,9,10,12
**whenever (5)**
56:24;57:22;58:7;
61:9;62:17
**Whereupon (3)**
28:5;40:2,4
**WHITE (25)**
9:22;12:21;18:6,19;
19:9;23:7,22;24:24;
26:6,16,24;33:8;
45:18;46:9;47:19;
51:12,25;55:19;57:9;
59:9;64:22;65:25;
66:6,17,24
**whose (1)**
64:3
**Wilmington (99)**
4:22;13:20,21,22,
24;14:3,11,15;15:6,
10,24;16:2,6,9,13,17,
20;17:5,13,16;18:5,
18;19:13,16,21,23;
20:4,11,15;21:21,25;
22:6,7;23:4;24:20;
25:4,11;36:16;38:5;
39:19;40:5,10,13,15,
18;41:16;42:4,7,11,
21,25;43:12,15;44:3,
7,15,20;45:12,16;
46:7,16;47:17,22;
48:6,8,9,10,11,13,15,
19,24;49:25;50:16;
51:8,22;52:11,15,21;
53:2,16,25;54:16,24;
57:10;58:6,15;60:5,
23;61:9;62:3,6;63:8,
11;64:6,10,18;65:8,22
**wind (1)**
26:2
**Windward (2)**
46:8;47:18
**wish (1)**
33:25
**within (4)**
3:16;7:9;13:15;
36:7
**without (3)**
7:24;14:20;43:10
**WITNESS (7)**
15:4;18:12,14,21;
27:17,21;66:16
**word (3)**
5:15;6:16;48:16
**work (4)**
12:2;16:13;27:9;

31:8
**worked (15)**
11:14;25:14;27:24;
28:7,21;29:10,24;
30:14;31:4;34:7,21;
35:14,18;36:2,6
**working (1)**
36:10
**works (2)**
18:2;62:6
**written (7)**
12:18;14:10;17:3

**X**

**XXXIII (3)**
34:9,14,19

**Y**

**year (1)**
36:18
**years (7)**
5:20;11:16;13:15;
17:19;36:7,25;41:2
**Yonel (19)**
15:22;16:24;38:8;
40:23,24;41:4,14,15;
43:10;44:10;46:15;
47:15;49:9;50:20;
52:19;54:18,19;
60:18,19
**Yonel's (1)**
41:5
**York (7)**
4:9,24;25:16;58:12,
21;64:4,7
**Young (1)**
4:19

**Z**

**Zoom (2)**
16:23;31:14

**1**

**1 (3)**
55:12,15,21
**10 (1)**
58:17
**10589 (1)**
64:4
**11 (2)**
61:18,22
**11747 (1)**
58:13
**13 (2)**
62:16,21
**14 (2)**
63:16,20
**1426 (1)**
64:3

**160B (1)**
58:20
**1688 (1)**
11:8
**17 (1)**
47:25
**19 (1)**
53:22
**19-cv-02380 (1)**
4:25

**2**

**2 (1)**
56:22
**20 (1)**
53:22
**2006 (1)**
64:14
**2010 (1)**
54:6
**2011 (1)**
54:6
**2016 (1)**
54:4
**2017 (5)**
54:4;58:19,21,24;
59:19
**2018 (6)**
47:25;53:22;54:3,
11;59:22;64:15
**2019 (7)**
4:24;62:9,12;65:24;
67:3,11,13
**2020 (1)**
36:18
**2021 (1)**
58:17
**24 (5)**
4:24;62:9,11;65:24;
67:3
**24th (2)**
67:11,13
**28 (3)**
65:16;67:6,21
**29 (2)**
67:6,21

**3**

**30 (3)**
65:16;67:6,21
**31 (1)**
67:25
**32 (1)**
67:25
**33139 (1)**
11:9

**4**

**42 (1)**
58:12

**5**

**57 (1)**
55:23

**6**

**66 (1)**
4:16

**9**

**9211 (1)**
4:16

# ERRATA SHEET
## CHANGES IN TESTIMONY

WILMINGTON PT CORP v. GARY PARKER
083122 WILMINGTON PT
EITAN KORB
August 31, 2022

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____            _____
SIGNATURE OF WITNESS                      DATE